GFF/RRG/THL:blj                                                    6054-8001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ACUITY MUTUAL INSURANCE COMPANY,    )
                                     )
              Plaintiff,             )
                                     )
vs.                                  )        No.: 08 CV 03417
                                     )
ZEAG USA, INC., a Delaware corporation, )
                                     )
              Defendant.             )

### SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Now comes the Plaintiff, Acuity Mutual Insurance Company, by and through its

attorneys, Johnson & Bell, Ltd., and for its Second Amended Complaint for Declaratory

Judgment against Defendant, Zeag USA, Inc., alleges the following:

### JURISDICTION AND VENUE

1.      This is an action for declaratory judgment brought pursuant to 28 U.S.C. § 2201.

2.      At all times relevant hereto, Acuity Mutual Insurance Company (hereinafter

"Acuity") was a Wisconsin domiciled mutual insurance company, with its principal place of

business in Sheboygan, Wisconsin, authorized to do business in the State of Illinois.

3.      At all times relevant hereto, Zeag USA, Inc. (hereinafter "Zeag") was a Delaware

corporation, with its principal place of business in Chicago, Illinois, and authorized to do

business in the State of Illinois.

4.      The amount in controversy herein exceeds $75,000.00.

5.      Jurisdiction in this Court is founded upon diversity of citizenship pursuant to 28

U.S.C. § 1332(a)(1).

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because the Defendant transacts business in the Northern District of Illinois and a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## THE UNDERLYING FACTS

7.    Standard Parking Corporation (hereinafter "Standard Parking") operates the parking facilities at O'Hare International Airport.

8.    Zeag is in the business of maintaining and updating revenue control systems at parking facilities, including the processing and recording of credit card transactions and the printing of credit card receipts.

9.    On or about October 15, 1998, Standard Parking and Zeag entered into a contract whereby Zeag agreed to maintain and service the revenue control systems at the O'Hare Airport Parking Facilities, which included repair, adjustment and reprogramming of software utilized in the printing of receipts provided to patrons parking at the O'Hare Airport Parking Facilities (hereinafter "the Contract").

## THE FAIR AND ACCURATE TRANSACTIONS ACT

10.    The Fair and Accurate Transactions Act, 15 U.S.C. 1681c(g), provides, in pertinent part, as follows:

> (g)    Truncation of credit card and debit card numbers.
>
> (1)    In general.  Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.
>
> *        *        *

(3)    Effective date

This subsection shall become effective - -

(A)    3 years after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is in use before January 1, 2005; and

(B)    1 year after December 4, 2003, with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is first put into use on or after January 1, 2005.

Fair and Accurate Transactions Act, 15 U.S.C. 1681c(g)(3) (LexisNexis 2008).

## THE *IVANOV* LAWSUIT

11.    On or about May 25, 2007, Benjamin Beringer and Tony Ivanov, individually and on behalf of a class (hereinafter "the class plaintiffs"), filed a Consolidated Class Action Complaint against Standard Parking and other defendants in the United States District Court for the Northern District of Illinois, under Cause Numbers 07 C 5027 and 07 C 5119 (hereinafter "the Ivanov lawsuit").   A true and accurate copy of the Ivanov lawsuit is attached hereto as **Exhibit A**.

12.    The Ivanov lawsuit claims that beginning on December 4, 2006, Standard Parking and others violated the Fair and Accurate Credit Transactions Act (hereinafter "FACTA"), codified at 15 U.S.C. § 1681c(g), by generating electronically printed receipts which showed eight digits of the class plaintiffs' credit card numbers and the expiration dates of the class plaintiffs' credit cards.

13.     The _Ivanov_ lawsuit alleges defendants knowingly or with reckless disregard engaged in business practices that violated plaintiffs' rights under FACTA.

14.     The _Ivanov_ lawsuit further asserts that in knowingly and willfully violating FACTA, Standard Parking and others failed to protect the class plaintiffs against identify theft, credit card fraud and debit card fraud.

## THE _STANDARD PARKING_ LAWSUIT

15.     On February 27, 2008, Standard Parking filed a Third-Party Complaint against Zeag, entitled _Standard Parking Corporation, Third Party Plaintiff, v. Zeag USA, Inc., Third Party Defendant_, under Cause Numbers 07 C 5027 and No. 07 C 5119 (hereinafter "the Standard Parking lawsuit").  A true and accurate copy of the Standard Parking lawsuit is attached hereto as **Exhibit B**.

16.     The Standard Parking lawsuit contains three claims for relief directed against Zeag, including:  breach of contract, negligence and breach of fiduciary duty.

17.     In the Standard Parking lawsuit, Standard Parking alleges that it requested that Zeag take the steps necessary to comply with FACTA, and that Zeag represented to Standard Parking that it would service the revenue control systems to comply with FACTA.  (Exhibit B, ¶ 11).

18.     The Standard Parking lawsuit alleges that under the Contract, Zeag agreed to observe and comply with all applicable laws of the federal government then or thereinafter in effect, which may, in any manner, affect the performance of the Contract.  (Exhibit B, ¶ 10).

19.     The Standard Parking lawsuit alleges that Zeag did not modify the revenue control systems to mask the printing of more than the last five digits of the credit card number or

the expiration date upon any receipt provided to a person who parked at the O'Hare Parking Facility. (Exhibit B, ¶ 12).

20.    The Standard Parking lawsuit alleges that as a result of Zeag's breach of the Contract, Zeag is liable for any and all damages that may be awarded to the class plaintiffs in the Ivanov lawsuit. (Exhibit B, ¶ 18).

21.    The Standard Parking lawsuit alleges that Zeag breached its duty to exercise reasonable care, good faith, skill and competence in providing services under the Contract by failing to comply with FACTA and by failing to mask the printing of more than the last five digits of the credit card number or expiration dates upon the parking receipts provided to parking patrons at the O'Hare Airport Parking Facility. (Exhibit B, ¶ 23).

22.    The Standard Parking lawsuit further alleges Zeag breached its fiduciary duty to Standard Parking to comply with FACTA by failing to mask the printing of more than the last five digits of the credit card number or expiration dates upon the parking receipts provided to parking patrons at the O'Hare Airport Parking Facility. (Exhibit B, ¶ 28).

## THE ACUITY POLICIES

23.    Acuity issued a Commercial General Liability Insurance policy to Zeag USA, Inc. as named insured, under policy no. L52851, effective March 2, 2007 though January 3, 2008, with limits of liability of $1,000,000 each occurrence; $1,000,000 personal and advertising injury; and $2,000,000 general aggregate (hereinafter "the Acuity policy"). A true and accurate copy of the Acuity policy is attached hereto as **Exhibit C**.

24.    Acuity additionally issued a Commercial Umbrella Insurance policy to Zeag USA, Inc. as named insured, under policy no. L52851, effective March 2, 2007 through January 3, 2008, with limits of liability of $1,000,000 each occurrence and $1,000,000 general aggregate

("the Acuity umbrella policy").  A true and accurate copy of the Acuity umbrella policy is attached hereto as **Exhibit D.**

25.     The Acuity policy provides, in its Insuring Agreement, relative to Bodily Injury and Property Damage Liability, in part, as follows:

**COVERAGE A –      BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

> **a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of *bodily injury* or *property damage* to which this insurance applies.  We will have the right and duty to defend the insured against any *suit* seeking those damages.  However, we will have no duty to defend the insured against any *suit* seeking damages for *bodily injury* or *property damage* to  which  this insurance does not apply. . . .

> \*      \*      \*

> **b.**      This insurance applies to *bodily injury* and *property* damage only if:

>> (1)      The *bodily injury* or *property damage* is caused by an occurrence that takes place in the coverage territory;
>> (2)      The *bodily injury* or *property damage* occurs during the policy period; and
>> (3)      Prior to the policy period, no insured listed under paragraph 1 of Section II – Who Is An Insured and no employee authorized by you to give or receive notice of an occurrence or claim, knew that the *bodily injury* or *property damage* had occurred, in whole or in part.

26.     The Acuity policy provides, in its Insuring Agreement, relative to Personal and Advertising Injury Liability, in part, as follows:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**

   **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of *personal and advertising injury* to which this insurance applies. We will have the right and duty to defend the insured against any *suit* seeking those damages. However, we will have no duty to defend the insured against any *suit* seeking damages for *personal and advertising injury* to which this insurance does not apply. . . .

   \*      \*      \*

   **b.**    This insurance applies to *personal and advertising injury* caused by an offense arising out of your business, but only if the offense was committed in the *coverage territory* during the policy period.

27.    The Acuity policy further contains the following exclusions to Coverage B:

2. **Exclusions**

This insurance does not apply to:

   **c.**    **Material Published Prior to Policy Period**

   *Personal and advertising injury* arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

   \*      \*      \*

   **f.**    **Breach of Contract**

   *Personal* and *advertising injury* arising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement.

   \*      \*      \*

28.    The Acuity policy further contains the following endorsement:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

\*        \*        \*

**B.**    The following exclusion is added to Paragraph 2, Exclusions of Section I – Coverage B – Personal and Advertising Injury Liability:

**2.    Exclusions**

This insurance does not apply to:

**Distribution of Material in Violation of Statutes**

*Personal* and *advertising injury* arising directly or indirectly out of any action or omission that violates or is alleged to violate:

    **a.**    The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

    **b.**    The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

    **c.**    Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

29.    The Acuity policy additionally provides the following definitions:

    **3.**    *"Bodily injury"* means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\*        \*        \*

    **14.**    *"Personal* and *advertising injury"* means injury, including consequential *bodily injury*, arising out of one or more of the following offenses:

\*        \*        \*

e.      Oral or written publication, in any manner, of material that violates a person's right of privacy;

**17.**    *"Property damage"* means:

a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the *occurrence* that caused it.

30.    The Acuity umbrella policy, in its Insuring Agreement, provides, in part, as follows:

**COMMERCIAL EXCESS LIABILITY COVERAGE FORM**

**1.      Insuring Agreement**

a.      We will pay those sums, in excess of the amount payable under the terms of any *underlying insurance*, that the insured becomes legally obligated to pay as damages because of *injury* or damage to which this insurance applies, provided that the *underlying insurance* also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.

We will also pay those sums that the insured becomes legally obligated to pay as damages because of *injury* or damage to which the insurance provided under the Coverage Extension applies as set forth in paragraph 4 below.

\*        \*        \*

d.      This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the *underlying insurance*. . .

31.    The Acuity umbrella policy further contains the following exclusion:

### 2.    Exclusions

The exclusions that apply to the *underlying insurance* apply to this insurance.

### COUNT I

### Declaratory Judgment: No Duty to Defend or Indemnify Zeag for the *Standard Parking* Lawsuit

32.    Acuity adopts and repeats the allegations of Paragraphs 1 through 31 as and for Paragraph 32 hereof and as though the same were fully set forth herein.

33.    Acuity has no duty to defend or indemnify Zeag against the allegations made or the damages sought in the Standard Parking lawsuit for any one or more of the following reasons:

A.    The Standard Parking lawsuit does not allege "bodily injury" or "property damage" as those terms are defined by the Acuity policy.

B.    The Standard Parking lawsuit alleges damages arising out of oral or written publication of material whose first publication took place before the beginning of the Acuity policy period.

C.    The Standard Parking lawsuit only alleges "personal and advertising injury" arising out of Zeag's breach of the Contract.

D.    The Standard Parking lawsuit only alleges "personal and advertising injury" arising out of violations of FACTA, which statute prohibits the sending, transmitting, communicating or distribution of certain material or information.

34.    The above contentions of Acuity are, on information and belief, denied by Zeag USA, Inc, which, in turn, contends that there is coverage for the Standard Parking

lawsuit. Acuity, in turn, denies the contrary contentions of Zeag USA, Inc. and each of them.

WHEREFORE, the Plaintiff, Acuity Mutual Insurance Company, respectfully requests that this Honorable Court enter an order finding and declaring the rights of the parties as follows:

a.   That Acuity Mutual Insurance Company has no duty to indemnify Zeag USA, Inc. under its policy of insurance No. L52851 for the allegations of the third-party lawsuit filed by Standard Parking Corporation in the United States District Court for the Northern District of Illinois, under Cause Nos. 07 CV 5027 and 07 C 5119.

b.   That Acuity Mutual Insurance Company is not obligated to defend Zeag USA, Inc. in the aforesaid action.

c.   That this Court grant Acuity Mutual Insurance Company such other and further relief as it deems just and fit under the circumstances.

d.   That Acuity Mutual Insurance Company be awarded and have and recover its just and reasonable costs incurred herein and have execution issued therefore.

## COUNT II

### Declaratory Judgment: No Duty to Defend or Indemnify Zeag Under the Acuity Umbrella Policy

35.   Acuity adopts and repeats the allegations of Paragraphs 1 through 31 as and for Paragraph 34 hereof and as though the same were fully set forth herein.

36.    Acuity has no duty to defend or indemnify Zeag under the umbrella policy issued to Zeag for the following reason:

A.    All applicable exclusions under the Acuity commercial general liability policy apply to prohibit coverage under the Acuity umbrella policy issued to Zeag as to the allegations alleged in the <u>Standard Parking</u> lawsuit.

37.    The above contentions of Acuity are, on information and belief, denied by Zeag USA, Inc, which, in turn, contends that there is coverage for the <u>Standard Parking</u> lawsuit. Acuity, in turn, denies the contrary contentions of Zeag USA, Inc. and each of them.

WHEREFORE, the Plaintiff, Acuity Mutual Insurance Company, respectfully requests that this Honorable Court enter an order finding and declaring the rights of the parties as follows:

a.    That Acuity Mutual Insurance Company has no duty to indemnify Zeag USA, Inc. under its commercial umbrella policy of insurance L52851 for the allegations of the third-party lawsuit filed by Standard Parking Corporation in the United States District Court for the Northern District of Illinois, under Cause Nos. 07 CV 5027 and 07 C 5119.

b.    That Acuity Mutual Insurance Company is not obligated to defend Zeag USA, Inc. in the aforesaid action.

c.    That this Court grant Acuity Mutual Insurance Company such other and further relief as it deems just and fit under the circumstances.

d.     That Acuity Mutual Insurance Company be awarded and have and

recover its just and reasonable costs incurred herein and have

execution issued therefore.

Respectfully submitted,

JOHNSON & BELL, LTD.

By: _____ s/ Glenn F. Fencl _____
One of the Attorneys for Plaintiff -
Acuity Mutual Insurance Company

Glenn F. Fencl A.R.D.C. #3126086
Richard R. Gordon A.R.D.C. #6277551
Tatum H. Lytle A.R.D.C. #6293269
Johnson & Bell, Ltd.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
(312) 372-0770

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN P. BERINGER, TONI IVANOV, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | Hon. Rebecca R. Pallmeyer |
| Plaintiffs, | ) ) | Mag. Judge Denlow |
| v. | ) ) | Consolidated |
| STANDARD PARKING O'HARE JOINT VENTURE; STANDARD PARKING CORPORATION, a Delaware Corporation; GLOBETROTTERS INTERNATIONAL, INC., an Illinois corporation; and DOES 1-10, | ) ) ) ) ) ) ) | 07 C 5027 07 C 5119 |
| Defendants. | ) ) | |

### CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Benjamin P. Beringer and Toni Ivanov, individually, and on behalf of others similarly situated, by and through their attorneys, hereby complain against defendants Standard Parking O'Hare Joint Venture, Standard Parking Corporation, Globetrotters International, Inc., and Does 1-10 for violations of the Fair and Accurate Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act ("FCRA") and state as follows:

### PARTIES

1. Plaintiff, Benjamin P. Beringer ("Beringer") resides within the Northern District of Illinois, Eastern Division.

2. Plaintiff, Toni Ivanov, ("Ivanov," collectively with Beringer "plaintiffs") resides within the Northern District of Illinois, Eastern Division.

3. Defendant Standard Parking O'Hare Joint Venture ("O'Hare Joint Venture") is a joint venture between defendants Standard Parking Corporation and Globetrotters, Inc. O'Hare Joint Venture was the party who contracted with the City of Chicago for the management of the parking facilities at O'Hare International Airport.

4. Defendant Standard Parking Corporation ("Standard Parking") is a Delaware corporation who conducts regular and systematic business within the district, including but not

**EXHIBIT**

_A_

limited to the transaction that is the basis of this complaint. Among other things, on information and belief, Standard Parking operates the parking facilities at O'Hare International Airport. Standard Parking also maintains an office and registered agent in Chicago, Illinois. Standard Parking is the Managing Agent of the O'Hare Joint Venture.

    5.    Defendant Globetrotters International, Inc. ("Globetrotters") is an Illinois corporation with its principal place of business located in Chicago, Illinois.

    6.    Defendants Does 1-10 are individual officers, directors, agents, and employees of defendants, who directed, participated in, or otherwise authorized the violations complained of herein.

## JURISDICTION

    7.    This Court has jurisdiction over the subject matter of this proceeding pursuant to the 28 U.S.C. §1331 and 15 U.S.C. §1681 *et seq.*

    8.    This Court has personal jurisdiction over the defendants in that Globetrotters is an Illinois Corporation, and therefore, O'Hare Joint Venture is a citizen of Illinois, and Standard Parking conducts regular and systematic business within the district.

    9.    Venue is proper in the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. §1391(b) and (c) in that defendants conduct business within the District, and the transaction that is the basis of plaintiff's complaint occurred within the District.

## THE STATUTE

    10.    The FACTA, codified as 15 U.S.C. §1681c(g) provides:

(g) Truncation of credit card and debit card numbers.
(1) In general. Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.
(2) Limitation. This subsection shall apply only to receipts that are electronically printed, and shall not apply to transactions in which the sole means of recording a credit card or debit card account number is by handwriting or by an imprint or copy of the card.
(3) Effective date. This subsection shall become effective--
(A) 3 years after the date of enactment of this subsection [enacted Dec. 4, 2003], with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is in use before January 1,

Case 1:08-cv-03417     Document 10-2     Filed 06/30/2008     Page 4 of 82

Case 1:07-cv-05119     Document 34     Filed 02/27/2008     Page 11 of 23
Case 1:07-cv-05027     Document 23     Filed 10/12/2007     Page 3 of 15

2005; and

(B) 1 year after the date of enactment of this subsection [enacted Dec. 4, 2003], with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions that is first put into use on or after January 1, 2005. 15 U.S.C. §1681c(g).

11.     Section 15 U.S.C. § 1681n(a) of the FACTA, entitled "Civil liability for willful noncompliance" provides:

(a) In general. Any person who willfully fails to comply with any requirement imposed under this title [15 USCS §§ 1681 *et seq.*] with respect to any consumer is liable to that consumer in an amount equal to the sum of--

(1)     (A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000; or

(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $ 1,000, whichever is greater;

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court. 15 USCS § 1681n(a).

### THE FACTS

12.     On information and belief, the legislature enacted the FACTA because it is possible for thieves to reproduce a credit card number by using the expiration date and the last four digits of the card number. The FACTA was enacted to prevent such identity theft should discarded receipts fall into the wrong hands.

13.     As stated in 15 U.S.C. §1681c(g)(3), the FACTA provided persons who accept credit cards or debit cards up to three years to comply with its requirements. All persons covered under the act were to come into full compliance with the provisions therein no later than December 4, 2006.

14.     On information and belief, defendants are a "person that accepts credit cards or debit cards for the transaction of business" as defined by the FACTA.

15.     Nevertheless, since December 4, 2006, each plaintiff has, on one or more occasions, used their credit card at the O'Hare International Parking facility operated by defendants and in

-3-

return received an electronically printed receipt that contained eight digits of their credit card number and the expiration date of their credit card.

16.    Defendants have knowingly and willfully violated the provisions of the FACTA set forth above, and in doing so has failed to protect plaintiffs and others similarly situated against identity theft, credit card and debit card fraud by acting in breach of the FACTA.

## CLASS ALLEGATIONS

17.    Plaintiffs bring this action on individually and as a Class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the following Class:

18.    The class is defined as all consumers whom used their credit card or debit card in any transaction occurring after December 4, 2006, at an O'Hare International Airport parking facility operated or controlled by defendants and were provided an electronically printed receipt at the point of sale or transaction, which like plaintiffs, displays either more than the five digits of the person's credit card or debit card number, and/or the expiration date of the person's credit card or debit card.

19.    The class is so numerous that joinder of each of the individual members in one action not be practical. O'Hare International Airport is one of the busiest airports in the world, servicing thousands of customers on a daily basis, untold percentages of which use the parking facilities. Standard Parking's website suggests that there are 22,505 parking spaces at O'Hare International Airport. Since December 4, 2006, defendants have likely has provided thousands, of electronically printed receipts that violate the provisions of the FACTA complained herein.

20.    Plaintiffs' claims are typical of the claims of all of the class members; all claims are based upon the same violation of the same Federal statute alleged to have occurred since December 4, 2006. Plaintiffs adequately and fairly represent the Class members. Plaintiffs do not have any interests that conflict with the interests of the Class members. In addition, plaintiffs have retained experienced counsel to assist in the adjunction of this matter.

21.    Common questions of law and fact exist that affect all of the Class members, which predominate over questions that may affect individual members that include:

-4-

(a)    Whether defendants have a business practice of providing its customers with an electronically printed receipt on which defendants have printed either more than five digits of the credit card or debit card number and/or the expiration date of the credit card or debit card;

(b)    Whether defendants' actions alleged herein have thereby violated the provisions of the FACTA;

(c)    Whether the conduct of defendants was willful; and

(d)    Determining the identity and involvement of the Doe defendants.

22.    The Class action form is superior to other available methods for the fair and efficient adjudication of this controversy and the claims of the Class members as the amount in controversy makes individual action economically unfeasible.

## VIOLATIONS

23.    On information and belief, defendant willfully violated 15 U.S.C. §1681c(g)(1) set forth above. Those provisions provide in pertinent part that:

> [N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the card holder at the point of sale or transaction. 15 U.S.C. §1681c(g)(1).

24.    Pursuant to 15 U.S.C. §1681c(g)(3)(B), machines that were put to use after January 1, 2005 required immediate compliance with the provisions of 15 U.S.C. §1681c(g)(1).

25.    For machines that were put into use before January 1, 2005, the specific provisions of 15 U.S.C. §1681c(g)(3)(B) required compliance with 15 U.S.C. §1681c(g)(1) on or after December 4, 2006.

26.    As stated, defendants are merchants that accept credit cards and/or debit cards within the meaning of the FACTA in the course of transacting business with persons like plaintiffs and the Class members. During the course of transacting business, defendants use cash register and/or other machines that electronically print receipts for credit card and/or debit card transactions as defined in the FACTA.

Case 1:08-cv-03417     Document 10-2     Filed 06/30/2008     Page 7 of 82

Case 1:07-cv-05119     Document 34     Filed 02/27/2008     Page 14 of 23
Case 1:07-cv-05027     Document 23     Filed 10/12/2007     Page 6 of 15

27.     Despite the specific provisions of the FACTA, and the three years it provided for compliance, after December 4, 2006, the effective date of the statute, defendants, at the point of sale or transaction, provided plaintiffs and each Class member with one or more electronically printed receipts on which defendant printed more than five digits of the credit card or debit card number and/or printed the expiration date of the credit or debit card.

28.     When the legislature enacted the FACTA in 2003, it gave merchants who accept credit card and/or debit cards up to three years to comply with its requirements. As stated, the FACTA required compliance with its provisions for all machines no later than December 4, 2006.

29.     On information and belief, defendants knew or should have known of the requirements of the FACTA prohibiting the printing of more than five digits of credit card numbers and/or expiration dates on credit card or debit card receipts.

30.     Moreover, years ago, VISA, MasterCard, and other entities began informing retailers of the need to truncate credit card information to comply with various state laws, with the credit card companies' policies, and/or FACTA. In fact, as early as July 2003, VISA implemented new operations regulations, applicable to new cash registers, in response to legislation in other states requiring suppression of the expiration date and some digits of the credit card number, requiring similar suppression of such information for VISA transactions.

31.     On information and belief, in addition to MasterCard and VISA, the PCI Security Standards Council – a consortium founded by the major credit card companies– and other companies that sell cash registers and other machines for the processing of credit or debit card payments, and other entities informed defendants about the provisions of the FACTA, including the specific requirements prohibiting the printing of more than five digits of credit card numbers and/or expiration dates on credit card or debit card receipts and that defendant needed to comply with those provisions.

32.     On information and belief, the FACTA's requirements were widely publicized among retailers and the public at large.

-6-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 8 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 15 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 7 of 15

33.    Indeed, on information and belief, most of defendants' competitors readily brought their credit card and debit card receipt printing process into compliance with the FACTA. Defendants could have done the same without difficulty. On information and belief, it would have been a simple task for defendants to either reprogram their machines to not violate those provisions hereto complained, or purchase new machines that did not violate the FACTA.

34.    However, defendants ignored all of these warnings, as well as the terms of the FACTA itself and continued to print prohibited information on customer receipts. These violations were not an accident or an isolated oversight. Rather, defendants knowingly, intentionally, or at least recklessly continued to use cash register or other machines that were not programed to, or otherwise did not, comply with the requirements as set forth in the FACTA.

35.    Defendants knew that its receipt printing practice contravened the rights of consumers under the FACTA, or, at least recklessly disregarded whether its practice violated its customers' rights. Defendants have willfully violated the provisions of the FACTA and continued to use cash registers or other machines or devices that print receipts that violate the requirements complained of herein.

36.    For example, in response to earlier state legislation enacting similar truncation requirements, on March 6, 2003, the CEO of Visa USA, Carl Pascarella, explained that "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. . . . The first phase of this new policy goes into effect July 1, 2003 for all new terminals. . . . ." "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference With Sen. Dianne Feinstein," PR Newswire, March 6, 2003.

37.    Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

38.    The card issuing organizations proceeded to require compliance with FACTA

-7-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 9 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 16 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 8 of 15

by contract, in advance of FACTA's mandatory compliance date.

39.    For example, the August 12, 2006 edition of "Rules for Visa Merchants" (p. 62), which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all." These statements were accompanied by a picture of a receipt showing precisely what had to be removed. VISA required complete compliance by July 1, 2006, five months ahead of the statutory deadline.

40.    Defendant accepts Visa cards and is a party to a contract requiring compliance with the above-quoted requirement.

41.    American Express has a manual that contains a similar depiction of what information must be suppressed.

42.    These requirements were widely publicized. The following are illustrative.

43.    On July 9, 2003, L. Richard Fischer of VISA USA presented a written statement to the House Committee on Financial Services supporting the truncation requirements of what ultimately became FACTA. Mr. Fischer stated:

> Although Visa generally believes that the details of preventing identity theft should be left to financial institutions that are best suited to address ever evolving fraud techniques, Title II could provide important benefits to consumers and financial institutions alike by establishing workable identity theft provisions and ensuring that these provisions benefit from national uniformity. For example, Section 203 of Title II would prohibit any merchant or other entity that accepts credit and debit cards from printing more than the last four digits of the card account number *or the expiration date* upon receipts provided to cardholders at the point of sale

44.    The Office of Thrift Supervision of the Treasury Department ("OTS"), is responsible,

*inter alia*, for compliance with FACTA by federal savings banks. Toward this end, the OTS publishes an Examination Handbook for OTS field personnel to use when they perform an examination, or compliance audit, of a given financial institution. The February 2006 edition of the Handbook states:

### Truncation of Credit and Debit Card Account Numbers

-8-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 10 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 17 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 9 of 15

> Ensure that electronically generated receipts from ATM and POS terminals or other machines do not contain more than the last five digits of the card number and do not contain the expiration dates.

45.    Heartland Payment Systems, Inc. provides credit and debit card, payroll and related processing services to restaurant, hotel and retail merchants throughout the United States, and indicates on its website that it provides services to over 137,000 merchants.  In 2003, Heartland broadly disseminated a pamphlet which included the following statement:

> Your credit card terminal is now–or will soon be required by law or the bankcard associations to truncate–or limit–the information that can appear on electronically printed sales receipts.
>
> What that means is that on all cardholder numbers:
>
> o    The expiration date must be eliminated
>
> o    All but the last four numbers of the card number must be obscured. . . . .

46.    In 2006, Heartland broadly disseminated a second pamphlet, which included the following statement:

> **Make every transaction a safe one. * * * ***
>
> o    The cardholder's receipt ***should not include*** the card's expiration date and ***should only include*** the last 4 or 5 digits of the card number.  * * * *

47.    Another credit card processor, Commerce Bank, sent "Merchant Compliance Awareness" notices to its customers during 2004.  These stated that all but the last four digits of the cardholder account number and the entire expiration date had to be suppressed from the receipt.

48.    Many restaurant and retail trade associations apprised their merchant members that FACTA imposed truncation requirements mirroring Visa's truncation requirements.  For example, the Virginia Retail Merchants Association reported in its February/March 2005 Newsletter that "FACTA says receipts for credit and debit card transactions may not include more than the last five digits of the card number or expiration date."

49.    In the April 23, 2003 edition of the monthly magazine for the National Association

of Convenience Stores, an article titled "Visa USA Targets Identity Theft," appeared   which included the following statement:

> [A]t a press conference held last month with Sen. Dianne Feinstein (D-CA), Visa announced its account truncation security policy. This protects consumers from identity theft by limiting cardholders' information on receipts to the last four digits of their accounts. The policy will also eliminate the card's expiration date from receipts altogether. Feinstein has introduced legislation to combat identity theft.

50.    The April 2005 edition of the Food Industry Advisor, the newsletter for the

Pennsylvania Food Merchants Association and Pennsylvania Convenience Store Council, included

an article regarding the requirements of credit card truncation under FACTA which included the

following language:

> [A]ccording to the FACTA Act, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.....

The same article appeared in the April 2005 Edition of the NACS Magazine, published by the

National Association of Convenience Stores.

51.    In its Spring 2004 Newsletter, the Connecticut Restaurant Association Newsletter

included an article regarding Requirements for Credit Card Truncation, which stated:

> [T]here is currently no Connecticut state law, so the two ruling requirements come from VISA and a new Federal Fair Credit Reporting Act signed in December 2003.
>
> Truncation requires that all but the last four digits of the cardholder account number, along with the entire expiration date, be suppressed on the cardholder copy of the transaction receipt generated from all electronic terminals....

52.    After the enactment of FACTA, the Wisconsin Restaurant Association issued a

"Credit Card Transaction" Alert to its members, which stated:

> You may have been hearing about credit card truncation lately. This is what you need to know.
>
> Credit card truncation removes all but the last four (or five) digits of a credit card account number ad the expiration date from the sales receipt. For example: A non-truncated receipt would list:
>
> Acct. # 1234 5678 7654 3210 Exp. 10/05
>
> while a truncated receipt would show:

-10-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 12 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 19 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 11 of 15

Acct. # **** **** **** 3210 Exp ****. .. . .

> The federal Fair and Accurate Credit Transaction Act of 2003, prohibits any person that accepts credit cards or debit cards from printing the expiration date and more than the last five digits of the card number upon any terminal-generated receipt provided to the cardholder at the point of sale....

53.    In the January 2005 edition of the Massachusetts Restaurant Association Newsletter, an article appeared apprising Association members that both Visa and MasterCard require truncation of the entire expiration date and all but the last four digits of the cardholder account number.

54.    Similar information was disseminated by the Ohio Restaurant Association, the Oklahoma Restaurant Association, and a significant number of other restaurant trade associations, and retail merchant trade associations.

55.    In the March/April 2006 Edition of the Ohio Independent Automobile Dealers' Association Dealer News Magazine, an article was published entitled "What You Should Know about Credit and Debit Card Processing and the FACTAs about Card Truncation." The article states:

> What is Card Truncation?  This federal law sets deadlines  by which the receipt electronically printed from a credit card sale must be truncated–meaning, the receipt given to the customer shows no more than the last five digits of the customer's credit card number and does not show the expiration date.
>
> Business owners are responsible for merchant account compliance with the truncation regulations and must make sure their printed cardholder receipts do not contain expiration dates or full account numbers.

This same article appeared in the March/April edition of the West Coast Independent Automobile Dealer News.

56.    The Independent Insurance Agents & Brokers of America circulated a report to its members dated June 5, 2005 titled: "Overview of the Fair Credit Reporting Act, The Fair and Accurate Credit Transactions Act, and the Drivers Privacy Protection Act." In relevant part, this publication stated:

> Under the FACT Act, businesses and others accepting credit or debit cards for payment may not print more than the last five digits of the card number nor may they

-11-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 13 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 20 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 12 of 15

print the expiration date upon any receipt provided to the cardholder at the point of sale.

57.    The November 18, 2004 edition of the Compliance Challenge, published by the Credit Union National Association News, stated: "FACTA prohibits anyone that accepts credit/debit cards to print more than the last 5 digits of the card number or expiration date on any receipt at the point of sale or transaction...."

58.    In the October 10, 2003, edition of the PT Bulletin, a Newsletter for the American Physical Therapy Association, an article appeared titled, "Truncation Requirement Now in Effect for Credit Card Processing." In relevant part, this article stated:

> Physical therapists who accept credit card payments from patients and clients face new processing requirements from major credit card companies. In an effort to minimize opportunities for credit card fraud, Visa and MasterCard...have mandated that credit card account numbers and expiration dates be masked on all receipts. Compliance with this requirement is not optional....

59.    Truncation standards, including the standards reflected in the Visa Merchant Rules and in FACTA, permit the publication of the last four or five digits of customer account numbers on the receipt presented to customers at the point of sale. The publication of this minimal amount of account information is necessary to facilitate merchant account reconciliation, processing of returns, etc. In isolation, the publication of *only* the last four or five digits of a customer account number significantly limits the extent to which a potential identity thief can effectively use customer receipts disseminated at the point of sale to facilitate identity theft.

60.    The publication of expiration dates on customer receipts disseminated at the point of sale, *in addition to* the last four or five digits of the customer account number, exponentially increases the possibility of identity theft, which is the obvious reason that Visa, and then Congress, requires the truncation of expiration dates.

61.    Credit and debit card account numbers are not randomly generated. Instead, account numbers reflect an internal coding scheme set forth by the International Organization for Standardization ("ISO") 7812, which defines the content in the cards' magnetic strips. Consistent

-12-

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 14 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 21 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 13 of 15

with this standard, every credit card number consists of the following: (a) a single digit Major

Industry Identifier ("MII"); (b) an issuer identification number ("IIN"); (c) an number unique to the

card; and (d) a check digit.

62.    The MII identifies the industry of the issuer of the card..

63.    The IIN consists of the first six digits of the card number and identifies the

specific issuer of the card.

64.    The seventh through next to the last digit, up to a maximum of 12 digits, is

the number unique to the card.

65.    The last digit is a "check digit" that is not randomly assigned, but instead is

calculated by a defined algorithm.  Therefore, the "check digit" is derivative of the other numbers

in the credit card number.

66.    Astute identity thieves are familiar with this coding paradigm and can use

sophisticated mathematical modeling to decipher account numbers.

67.    To the extent that an identity thief is able to decipher a credit card user's account

number, the importance of truncating expiration dates becomes manifest.  That is, unlike the account

number on the credit or debit card, the expiration date cannot be deciphered through sophisticated

mathematical modeling.  Therefore, the expiration date is an important security check that

corroborates that a person attempting to use a given account number is actually the authorized user

of the card.

68.    The expiration dates are also used to confirm that a person making a purchase

over the phone or on the internet actually has the card in their possession.

69.    Banks and credit card associations (i.e. Visa, MasterCard, American Express,

etc.) are keenly aware of the importance of truncating expiration dates.

70.    In addition, a would be identity thief who steals a receipt containing the last four or

five digits of a credit card account number *and* an expiration date can use that data in an attempt to

dupe the cardholder, or other potential information sources, into disclosing additional confidential

-13-

financial information relating to the cardholder. The more information that is disclosed on the receipt, the easier it is to pilfer additional confidential financial information.

71.     The costs of truncating credit and/or expiration dates and account numbers is minimal.

72.     Most of defendant's business peers and competitors readily brought their credit card and debit card receipt printing process into compliance with FACTA by programming their card machines and devices to comply with the truncation requirement. Defendant could have readily done the same.

73.     Defendants willfully disregarded FACTA's requirements and continued to use cash registers or other machines or devices that print receipts in violation of FACTA.

## JURY DEMAND

74..    Plaintiffs demand a jury on all issues so triable.

WHEREFORE, Plaintiffs, Benjamin P. Beringer and Toni Ivanov individually and on behalf of other similarly situated, request this Honorable Court enter judgment in favor of plaintiffs and the Class members and against defendants as follows:

(a)     Statutory damages pursuant to 15 U.S.C. § 1681n(a);

(b)     Pursuant to 15 U.S.C. § 1681n(a)(3), attorney's fees, litigation expenses, and costs;

(c)     Such other relief as the Court deems equitable and just under the circumstances.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel Lynch  (Ill. Bar No. 6202499)
Henry Baskerville  (Ill. Bar No. 6285712)
The Law Offices of Daniel Lynch
150 South Wacker Dr., Suite 2600
Chicago, Illinois 60606
312-346-8700 (tel)  / 312-346-5180 (fax)

Case 1:08-cv-03417    Document 10-2    Filed 06/30/2008    Page 16 of 82

Case 1:07-cv-05119    Document 34    Filed 02/27/2008    Page 23 of 23
Case 1:07-cv-05027    Document 23    Filed 10/12/2007    Page 15 of 15

Oren S. Giskan
Giskan, Solotaroff, and Anderson, LLP
11 Broadway, Suite 2150
New York, NY 10004
212-847-8315 (tel) / 646-520-3237 (fax)

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Zachary Jacobs
Edelman, Combs, Latturner & Goodwin, LLC
120 South LaSalle Street, 18th Floor
Chicago, IL 60603
312-739-4200 (tel) / 312-419-3079 (fax)

-15-

# EXHIBIT B



COPY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN P. BERRINGER and TONY IVANOV, individually and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 5027 No. 07 C 5119 (Consolidated) |
| v. | ) ) ) | |
| STANDARD PARKING CORPORATION, a Delaware corporation, and DOES 1-10, | ) ) ) | District Court Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | **JURY TRIAL DEMANDED** |
| STANDARD PARKING CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) ) | |
| ZEAG USA, INC., a Delaware corporation, | ) ) ) | |
| Third-Party Defendant. | ) | |

## DEFENDANT/THIRD-PARTY PLAINTIFF, STANDARD PARKING CORPORATION'S, THIRD-PARTY COMPLAINT AGAINST ZEAG USA, INC.

Defendant Third-Party Plaintiff, Standard Parking Corporation, by its attorneys, Richard

G. Schultz and Steven H. Gistenson, asserts this third-party action against Third-Party

Defendant, ZEAG USA, Inc., as follows:

471837.2 045135-39920

**EXHIBIT**

B

## Jurisdiction And Venue

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to 28 USC §1332, because the action arises under the Fair and Accurate Credit Transaction Act, 15 USC §1681c(g) and 15 USC §1681n(a) ("FACTA").

2.     This Court also has supplemental jurisdiction over the claims in this Third-Party Complaint pursuant to 28 USC §1367, because the claims arise from the same transaction as the original claim brought by the Plaintiffs, Berringer and Ivanov, in which they seek class certification ("Plaintiffs").

3.     Venue is proper in this District pursuant to 28 USC §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## Parties

4.     Standard Parking Corporation ("Standard Parking") is a corporation duly incorporated according to the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.

5.     ZEAG USA, Inc. ("ZEAG") is a corporation duly incorporated according to the laws of the State of Delaware and conducts business in Chicago, Illinois.  On information and belief, PES Parking Technologies, Inc. changed its name to PES America, Inc., which then changed its name to ZEAG.

## The Facts

6.     Standard Parking is in the business of managing parking facilities on behalf of owners of the facilities, and it manages the public parking facilities at O'Hare International Airport ("the O'Hare Airport Parking Facility") on behalf of the City of Chicago.

7.    The Plaintiffs have filed a Complaint against Standard Parking, seeking a certification of a class, alleging that Standard Parking violated FACTA by issuing printed receipts to persons who paid for parking at the O'Hare Airport Parking Facility which contained more than the last five digits of the person's credit or debit card or the expiration date of the credit or debit card.  (A copy of the Complaint is attached hereto as Exhibit A.)

8.    ZEAG, and its predecessors, provide expertise and comprehensive services to maintain and update revenue control systems at parking facilities, including the processing and recording of credit card transactions and the printing of credit card receipts generated in connection with the payment of parking fees and reprogramming, servicing and adjusting the revenue control systems.

9.    On October 15, 1998, Standard Parking entered into a contract with ZEAG's predecessor, PES Parking Technology, Inc. ("Contract") to provide maintenance and service of the revenue control systems of the O'Hare Airport Parking Facilities, which includes, among other things, repairs, adjustments and reprogramming of software utilized in the printing of receipts provided to patrons who park at the O'Hare Airport Parking Facilities.  The contract, as amended, expires on December 31, 2008.

10.    ZEAG agreed in the Contract that, in performing the services, it will furnish its best professional expertise and judgment in furthering the interests of Standard Parking and the City of Chicago; it will act in a fiduciary capacity to Standard Parking; it will provide its professional and fiduciary obligations in performing services under the Contract to assure timely and satisfactory completion of its services; and it will at all times observe and comply with all applicable laws of the federal government then or hereinafter in effect, which may, in any manner, affect the performance of the Contract.

11.   Pursuant to the Contract, Standard Parking informed ZEAG that Standard Parking was going to be required to mask credit card receipts based on new federal legislation and requested ZEAG to take necessary steps to comply with that legislation.  ZEAG represented to Standard Parking that it would perform the necessary service to comply with the new federal legislation, and in September 2004, Standard Parking paid for this service upon being informed by ZEAG that it had performed the requested services.

12.   ZEAG failed to provide the agreed-upon services, for it did not modify the revenue control systems to mask the printing of more than the last five digits of the credit card number or the expiration date upon any receipt provided to the person who parked at the O'Hare Airport Parking Facility.

13.   The injuries alleged by the Plaintiffs in their Complaint, if any, occurred without any fault on the part of Standard Parking.

14.   If Standard Parking is compelled to pay any damages to any of the Plaintiffs, then it has, and asserts, a right to recover against ZEAG the amount of any such damages, together with reasonable costs and attorneys' fees incurred by Standard Parking arising out of ZEAG's breach of contract, negligent acts, and breach of fiduciary duty as alleged in Counts I, II and III, respectively.

## COUNT I

### Breach of Contract
### (Against Third-Party Defendant)

15.   Standard Parking restates and realleges the allegations set forth in paragraphs 1 through 14 as if fully set forth herein as paragraph 15.

16.   Standard Parking has fully performed all of its obligations under the Contract.

17.   ZEAG breached the Contract by failing to provide the agreed-upon services.

471837.2 045135-39920                          4

18.    As a direct and proximate result of ZEAG's breach of the Contract, ZEAG is liable for any and all damages that may be awarded in favor of the Plaintiffs, or any of them, against Standard Parking, plus reasonable costs and attorneys' fees incurred by Standard Parking arising out of ZEAG's breach of Contract.

## COUNT II

### Negligence
### (Against Third-Party Defendant)

19.    Standard Parking restates and realleges the allegations set forth in paragraphs 1 through 14 as if fully set forth herein as paragraph 19.

20.    ZEAG, as a fiduciary to Standard Parking, owed Standard Parking a duty to exercise reasonable care, good faith, skill, and competence normally exhibited by a professional in modifying the revenue control systems at the O'Hare Airport Parking Facility to comply with the new federal legislation requiring the masking of credit cards receipts provided to parking patrons.

21.    ZEAG represented to Standard Parking that it would take necessary action to modify the revenue control systems to comply with the new federal legislation requiring the masking of credit card receipts provided to patrons who park at the O'Hare Airport Parking Facility.

22.    Standard Parking acted in reasonable reliance upon ZEAG's representations.

23.    ZEAG breached its duty to Standard Parking to exercise reasonable care, good faith, skill, and competence in providing services under the Contract to comply with the new federal legislation by negligently failing to mask the printing of more than the last five digits of the credit card number or the expiration date upon the receipts provided to parking patrons at the O'Hare Airport Parking Facility.

471837.2 045135-39920                                                5

24.    As a direct and proximate result of its negligence, ZEAG is liable for any and all damages that may be awarded in favor of the Plaintiffs, or any of them, against Standard Parking, plus reasonable costs and attorneys' fees incurred by Standard Parking arising out of ZEAG's negligence.

## COUNT III

### Breach of Fiduciary Duty
### (Against Third-Party Defendant)

25.    Standard Parking restates and realleges the allegations set forth in paragraphs 1 through 11 and 14 as if fully set forth herein as paragraph 25.

26.    ZEAG owed Standard Parking a fiduciary duty under the Contract to comply with all applicable federal laws, including FACTA that required the masking of credit card receipts provided to parking patrons.  In addition, Standard Parking requested ZEAG comply with federal law requiring masking of credit cards.

27.    Standard Parking placed trust and confidence upon ZEAG's assurances in the Contract that it would fulfill its fiduciary duty to comply with all federal laws relating to the function and performance of the revenue control systems at the O'Hare Airport Parking Facility.

28.    ZEAG breached its fiduciary duty to Standard Parking to comply with FACTA by failing to mask the printing of more than the last five digits of the credit card number or the expiration date upon the receipts provided to parking patrons at the O'Hare Airport Facility.

29.    As a direct and proximate result of its breach of fiduciary duty to comply with FACTA, ZEAG is liable for any and all damages that may be awarded in favor of the Plaintiffs, or any of them, against Standard Parking, plus reasonable costs and attorneys' fees incurred by Standard Parking arising out of ZEAG's breach of its fiduciary duty.

WHEREFORE, Third-Party Plaintiff, Standard Parking Corporation, demands judgment against Third-Party Defendant, ZEAG USA, Inc., for all sums that may be awarded in favor of the Plaintiffs, or any of them, against Standard Parking, plus reasonable costs and attorneys' fees incurred by Standard Parking arising out of ZEAG USA, INC.'s breach of contract, negligent acts and breach of fiduciary duty, and such other relief as this Court deems fair and just.

**JURY TRIAL DEMANDED**

Respectfully submitted,

STANDARD PARKING CORPORATION,
Third-Party Plaintiff

By: _____s/Richard G. Schultz_____
        One of its Attorneys

Richard G. Schultz (2515830)
Steven H. Gistenson (6192212)
Jennifer Zlotow (6270106)
Schwartz Cooper Chartered
180 N. LaSalle St., Suite 2700
Chicago, IL 60601
312-346-1300 (telephone)
312-782-8416 (facsimile)

471837.2 045135-39920

7

# EXHIBIT C



**COMMERCIAL GENERAL LIABILITY
CHANGES**

First Named Insured and Address:

ZEAG USA INC
4825 GLUMACK DR
SAINT PAUL MN 55111

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:   L52851

Change Effective Date:   03-02-07

**PREMIUM SUMMARY**

Additional Premium Applied to Your Balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    22,858.00
Direct Billed

**CHANGES:**

ADDED COMMERCIAL GENERAL LIABILITY COVERAGE PART

**EXHIBIT**

C

IL-7007 (6-01)                        Policyholder - Origi                        SO 01 04/20/07


A Mutual Insurance Company

**COMMERCIAL GENERAL LIABILITY**
**COVERAGE PART**

### Amended Declarations

First Named Insured and Address:

ZEAG USA INC
4825 GLUMACK DR
SAINT PAUL MN 55111

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:  L52851

Policy Period:   Effective Date:      03-02-07

Expiration Date:    01-03-08

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

## COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART

| Form Number | Form Title | Premium |
|---|---|---|
| CG-0001R (08-06) | Commercial General Liability Coverage Form .......................$ | |
| CG-0122F (07-98) | Minnesota Changes - Contractual Liab Exclusion and Supplementary Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-0300F (01-96) | Deductible Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2147F (07-98) | Employment - Related Practices Exclusion . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7066 (07-98) | Commercial General Liability - Amendment - Minnesota . . . . . . . . . . . . . | |
| IL-0017F (11-98) | Common Policy Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-0021F (11-85) | Nuclear Energy Liability Exclusion - Broad Form . . . . . . . . . . . . . . . . . . . | |
| IL-7012 (11-05) | Asbestos Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-7027 (01-02) | Minnesota Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2167F (04-02) | Fungi or Bacteria Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2171R (12-02) | Limited Terrorism Exclusion (Other than Cert Acts); Cap on Losses . . . . . | 259.00 |
| IL-0985R (01-06) | Disclosure Pursuant to Terrorism Risk Insurance Act of 2002 . . . . . . . . . . | |
| CG-0062F (12-02) | War Liability Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2681F (11-02) | Minnesota Changes - Duties Condition . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7300 (09-04) | ACUITY Advantages - General Liability . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-0067F (03-05) | Exclusion - Violation of Statutes that Govern E-mails, Fax, Phone Calls or Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2187R (01-07) | Conditional Exclusion of Terrorism (Relating to Disposition of Federal Act) | |
| CG-2011F (11-85) | Additional Insured - Managers or Lessors of Premises . . . . . . . . . . . . . . . | 1,083.00 |
| CG-7117 (06-06) | Illinois Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7141 (01-96) | Illinois Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2176R (11-02) | Exclusion of Punitive Damages Related to a Certified Act of Terrorism . . . | |

**Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    1,342.00**

Page 2
Policy Number:      L52851
Effective Date:      03-02-07

## PREMIUM SUMMARY

Advance Schedule Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$   25,836.00

Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,342.00

**Total Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$   **27,178.00**

The Total Advance Premium shown above is based on the exposures you told us you would have when this coverage part began. We will audit this coverage part in accordance with Section IV - Conditions, item 5 Premium Audit at the close of the audit period.

## LIMITS OF INSURANCE

General Aggregate Limit (Other Than Products-Completed Operations) . . . . . . . . . . . . . .$   2,000,000

Products-Completed Operations Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

Personal and Advertising Injury Limit (Any One Person or Organization) . . . . . . . . . . . . . .    1,000,000

Each Occurrence Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

Damage to Premises Rented to You Limit (Any One Premises) . . . . . . . . . . . . . . . . . . . . .    100,000

Medical Expense Limit (Any One Person) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000

*ACUITY* Advantages - General Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . See CG-7300

## SCHEDULE OF LIABILITY CLASSIFICATIONS

| Unit No. | Classification Description | Class Code | Premium Basis[1] | | Rates Premises | Rates Products | Advance Premium |
|---|---|---|---|---|---|---|---|
| **Minnesota** | | | | | | | |
| 005 | PARKING SYSTEMS - INSTALLATION SERVICE OR REPAIR | 44444 | 225,000 | P | 16.909 | 24.316 | $  9,276.00 |
| 006 | PARKING SYSTEMS EQUIPMENT DISTRIBUTORS | 44444 | 1,625,000 | G | .377 | 1.325 | 2,766.00 |
| **Illinois** | | | | | | | |
| 007 | PARKING SYSTEMS - INSTALLATION SERVICE OR REPAIR | 44444 | 225,000 | P | 23.455 | 23.652 | 10,599.00 |
| 008 | PARKING SYSTEMS EQUIPMENT DISTRIBUTORS | 44444 | 1,625,000 | G | .700 | 1.266 | 3,195.00 |

**Advance Schedule Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $   **25,836.00**

## AUDIT PERIOD

Annual

|  | Page 3 |
|---|---|
| Policy Number: | L52851 |
| Effective Date: | 03-02-07 |

**FIRST NAMED INSURED IS:**

ORGANIZATION OTHER THAN PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY

**ADDITIONAL NAMED INSUREDS**

WHO IS AN INSURED (Section II) includes the following Additional Named Insureds:

NONE

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

4825 GLUMACK DR
SAINT PAUL, MN 55111

203 N LASALLE ST
CHICAGO, IL 60601

10,000 W O'HARA BLVD
CHICAGO, IL 60602

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is an Insured.

Other words and phrases that appear in italics have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of *bodily injury* or *property damage* to which this insurance applies. We will have the right and duty to defend the insured against any *suit* seeking those damages. However, we will have no duty to defend the insured against any *suit* seeking damages for *bodily injury* or *property damage* to which this insurance does not apply. We may at our discretion investigate any *occurrence* and settle any claim or *suit* that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to *bodily injury* and *property damage* only if:

      (1) The *bodily injury* or *property damage* is caused by an *occurrence* that takes place in the *coverage territory;*

      (2) The *bodily injury* or *property damage* occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under paragraph 1 of Section II - Who Is An Insured and no *employee* authorized by you to give or receive notice of an *occurrence* or claim, knew that the *bodily injury* or *property damage* had occurred, in whole or in part. If such a listed insured or authorized em-

   ployee knew, prior to the policy period, that the *bodily injury* or *property damage* occurred, then any continuation, change or resumption of such *bodily injury* or *property damage* during or after the policy period will be deemed to have been known prior to the policy period.

   c. *Bodily injury* or *property damage* which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under paragraph 1 of Section II - Who Is An Insured or any *employee* authorized by you to give or receive notice of an *occurrence* or claim, includes any continuation, change or resumption of that *bodily injury* or *property damage* after the end of the policy period.

   d. *Bodily injury* or *property damage* will be deemed to have been known to have occurred at the earliest time when any insured listed under paragraph 1 of Section II - Who Is An Insured or any *employee* authorized by you to give or receive notice of an *occurrence* or claim:

      (1) Reports all, or any part, of the *bodily injury* or *property damage* to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the *bodily injury* or *property damage;* or

      (3) Becomes aware by any other means that *bodily injury* or *property damage* has occurred or has begun to occur.

   e. Damages because of *bodily injury* include damages claimed by any person or organization for care, loss of services or death resulting at any time from the *bodily injury.*

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected or Intended Injury**

      *Bodily injury* or *property damage* expected or intended from the standpoint of the insured. This exclusion does not apply to

*bodily injury* resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

*Bodily injury* or *property damage* for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an *insured contract,* provided the *bodily injury* or *property damage* occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an *insured contract,* reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of *bodily injury* or *property damage* provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same *insured contract;* and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

*Bodily injury* or *property damage* for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation and Similar Laws**

Any obligation of the insured under a Workers' Compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

*Bodily Injury* to:

(1) An *employee* of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that *employee* as a consequence of paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an *insured contract.*

**f. Pollution**

(1) *Bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants:*

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) *Bodily injury* if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) *Bodily injury* or *property damage* for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) *Bodily injury* or *property damage* arising out of heat, smoke or fumes from a *hostile fire;*

(b) At or from any premises, site or location which is or was at any time used by or for any insured or

others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

   (i)   Any insured; or

   (ii)  Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the *pollutants* are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

   (i)   *Bodily injury* or *property damage* arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of *mobile equipment* or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the *bodily injury* or *property damage* arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

   (ii)  *Bodily injury* or *property damage* sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

   (iii) *Bodily injury* or *property damage* arising out of heat, smoke or fumes from a *hostile fire;*

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of *pollutants*.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of *pollutants;* or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of *pollutants*.

However, this paragraph does not apply to liability for damages because of *property damage* that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or *suit* by or on behalf of a governmental authority.

**g. Aircraft, Auto or Watercraft**

*Bodily injury* or *property damage* arising out of the ownership, maintenance, use or entrustment to others of any aircraft, *auto* or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and *loading or unloading.*

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the *occurrence* which caused the *bodily injury* or *property damage* involved the ownership, maintenance, use or entrustment to others of any aircraft, *auto* or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

   (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an *auto* on, or on the ways next to, premises you own or rent, provided the *auto* is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any *insured contract* for the ownership, maintenance or use of aircraft or watercraft; or

(5) *Bodily injury* or *property damage* arising out of the operation of any of the equipment listed in paragraph f(2) or f(3) of the definition of *mobile equipment.*

**h. Mobile Equipment**

*Bodily injury* or *property damage* arising out of:

(1) The transportation of *mobile equipment* by an *auto* owned or operated by or rented or loaned to any insured; or

(2) The use of *mobile equipment* in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

*Bodily injury* or *property damage* due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage to Property**

*Property damage* to:

(1) Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the *property damage* arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the *property damage* arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because *your work* was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to *property damage* (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are *your work* and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to *property damage* included in the *products-completed operations hazard.*

**k. Damage to Your Product**

*Property damage* to *your product* arising out of it or any part of it.

**l. Damage to Your Work**

*Property damage* to *your work* arising out of it or any part of it and included in the *products-completed operations hazard.*

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

*Property damage* to *impaired property* or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in *your product* or *your work*; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to *your product* or *your work* after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) *Your product*;

(2) *Your work*; or

(3) *Impaired property;*

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal and Advertising Injury**

*Bodily injury* arising out of *personal and advertising injury.*

**p. Lead**

*Bodily injury* or *property damage* arising out of the actual, alleged or threatened ingestion, inhalation, absorption, exposure or presence of lead in any form or from any source.

Coverage also does not apply to any loss, cost, expense, fine or penalty arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, dispose of or in any way respond to or assess the effects of lead in any form; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, disposing of or in any way responding to or assessing the effects of lead in any form.

Exclusions c through n and p do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits of Insurance.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of *personal and advertising injury* to which this insurance applies. We will have the right and duty to defend the insured against any *suit* seeking those damages. However, we will have no duty to defend the insured against any *suit* seeking damages for *personal and advertising injury* to which this insurance does not apply. We may at our discretion investigate any offense and settle any claim or *suit* that may result. But:

(1) The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

**b.** This insurance applies to *personal and advertising injury* caused by an offense arising out of your business, but only if the offense was committed in the *coverage territory* during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation of Rights of Another**

*Personal and advertising injury* caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict *personal and advertising injury.*

**b. Material Published with Knowledge of Falsity**

*Personal and advertising injury* arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior to Policy Period**

*Personal and advertising injury* arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

*Personal and advertising injury* arising out of a criminal act committed by or at the direction of any insured.

**e. Contractual Liability**

*Personal and advertising injury* for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach of Contract**

*Personal and advertising injury* arising out of a breach of contract, except an implied contract to use another's advertising idea in your *advertisement.*

**g. Quality or Performance of Goods - Failure to Conform to Statements**

*Personal and advertising injury* arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your *advertisement.*

**h. Wrong Description of Prices**

*Personal and advertising injury* arising out of the wrong description of the price of goods, products or services stated in your *advertisement.*

**i. Infringement of Copyright, Patent, Trademark or Trade Secret**

*Personal and advertising injury* arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. However, this exclusion does not apply to infringement, in your *advertisement,* of copyright, trade dress or slogan.

**j. Insureds in Media and Internet Type Business**

*Personal and advertising injury* committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting.

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14a, b and c of *personal and advertising injury* under the Definitions Section; or

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms or Bulletin Boards**

*Personal and advertising injury* arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use of Another's Name or Product**

*Personal and advertising injury* arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

*Personal and advertising injury* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants* at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any in-

sured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of *pollutants;* or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of *pollutants.*

**o. Lead**

*Personal and advertising injury* arising out of the actual, alleged or threatened ingestion, inhalation, absorption, exposure or presence of lead in any form or from any source.

Coverage also does not apply to any loss, cost, expense, fine or penalty arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, dispose of or in any way respond to or assess the effects of lead in any form; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, disposing of or in any way responding to or assessing the effects of lead in any form.

**COVERAGE C - MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for *bodily injury* caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the *coverage territory* and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the

applicable Limit of Insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for *bodily injury:*

### a. Any insured.

To any insured, except *volunteer workers.*

### b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

### c. Injury on Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

### d. Workers' Compensation and Similar Laws

To a person, whether or not an *employee* of any insured, if benefits for the *bodily injury* are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

### e. Athletics Activities

To a person injured while taking part in athletics.

### f. Products-Completed Operations Hazard

Included within the *products-completed operations hazard.*

### g. Coverage A Exclusions

Excluded under Coverage A.

### h. War

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any *suit* against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or *suit,* including actual loss of earnings up to $250 a day because of time off from work.

   e. All costs taxed against the insured in the *suit.*

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

   These payments will not reduce the Limits of Insurance.

2. If we defend an insured against a *suit* and an indemnitee of the insured is also named as a party to the *suit,* we will defend that indemnitee if all of the following conditions are met:

   a. The *suit* against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an *insured contract;*

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same *insured contract;*

   d. The allegations in the *suit* and the information we know about the *occurrence* are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such *suit* and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the *suit;*

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection

with the *suit;*

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the *suit;* and

(b) Conduct and control the defense of the indemnitee in such *suit.*

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph 2b(2) of Section I - Coverage A - Bodily Injury and Property Damage Liability, such payments will not be deemed to be damages for *bodily injury* and *property damage* and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in paragraph f above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your *executive officers* and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your *volunteer workers* only while performing duties related to the conduct of your business, or your *employees,* other than either your *executive officers* (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these *employees* or *volunteer workers* are insureds for:

      (1) *Bodily injury* or *personal and advertising injury:*

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-*employee* in the course of his or her employment or performing duties related to the conduct of your business, or to your other *volunteer workers* while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-*employee* or *volunteer worker* as a consequence of paragraph (a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) *Property damage* to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your *employees,* or *volunteer workers,* any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your *employee*) or *volunteer worker* or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

   **(1)** With respect to liability arising out of the maintenance or use of that property; and

   **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to *mobile equipment* registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organiza-

tion is an insured with respect to:

   **a.** *Bodily injury* to a co-*employee* of the person driving the equipment; or

   **b.** *Property damage* to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **b.** Coverage A does not apply to *bodily injury* or *property damage* that occurred before you acquired or formed the organization; and

   **c.** Coverage B does not apply to *personal and advertising injury* arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or *suits* brought; or

   **c.** Persons or organizations making claims or bringing *suits.*

**2.** The General Aggregate Limit is the most we will pay for:

   **a.** The sum of:

      **(1)** Medical expenses under Coverage C; and

      **(2)** Damages under Coverage A, except damages because of *bodily injury* or *property damage* included in the *products-completed operations hazard.*

   With respect to the above items, the General Aggregate Limit applies separately to:

      **(1)** Each location owned by or rented to you. A location is a premises involving the same or connecting lots, or a premises whose connection is interrupted

only by a street, roadway, waterway or right-of-way of a railroad, and

      **(2)** Each of your projects away from a location owned by or rented to you; or

   **b.** Damages under Coverage B.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of *bodily injury* and *property damage* included in the *products-completed operations hazard.*

**4.** Subject to 2 above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all *personal and advertising injury* sustained by any one person or organization.

**5.** Subject to 2 or 3 above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage A; and

   **b.** Medical expenses under Coverage C;

   because of all *bodily injury* and *property damage* arising out of any one *occurrence.*

6. Subject to 5 above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of *property damage* to any one premises, while rented to you for a period of 7 or fewer consecutive days or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5 above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of *bodily injury* sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties in the Event of Occurrence, Offense, Claim or Suit**

a. You must see to it that we are notified as soon as practicable of an *occurrence* or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the *occurrence* or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the *occurrence* or offense.

b. If a claim is made or *suit* is brought against any insured, you must:

(1) Immediately record the specifics of the claim or *suit* and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or *suit* as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or *suit;*

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the *suit;* and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a *suit* asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured, but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for *your work;*

(b) That is Fire insurance for premises

rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for *property damage* to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, *autos* or watercraft to the extent not subject to Exclusion g of Section I - Coverage A - Bodily Injury and Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any *suit* if any other insurer has a duty to defend the insured against that *suit*. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all of the other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the First Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the First Named Insured.

**c.** The First Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation of Insureds**

Except with respect to the Limits of Insurance and any rights or duties specifically assigned in this Coverage Part to the First Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or *suit* is brought.

**8. Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring *suit* or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the First Named Insured shown in the Declarations, written notice of nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

# SECTION V - DEFINITIONS

1. *"Advertisement"* means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. *"Auto"* means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But *auto* does not include *mobile equipment.*

3. *"Bodily injury"* means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. *"Coverage territory"* means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places not included in a above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a above;

      (2) The activities of a person whose home is in the territory described in a above, but is away for a short time on your business; or

      (3) *Personal and advertising injury* offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a *suit* on the merits, in the territory described in a above or in a settlement we agree to.

5. *"Employee"* includes a *leased worker. Employee* does not include a *temporary worker.*

6. *"Executive officer"* means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. *"Hostile fire"* means one which becomes uncontrollable or breaks out from where it was intended to be.

8. *"Impaired property"* means tangible property,

other than *your product* or *your work,* that cannot be used or is less useful because:

   a. It incorporates *your product* or *your work* that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of *your product* or *your work;* or

   b. Your fulfilling the terms of the contract or agreement.

9. *"Insured contract"* means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an *insured contract;*

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement; or

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for *bodily injury* or *property damage* to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for *bodily injury* or *property damage* arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or

drawings and specifications; or

   (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

**10.** *"Leased worker"* means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. *Leased worker* does not include a *temporary worker*.

**11.** *"Loading or unloading"* means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or *auto;*

   **b.** While it is in or on an aircraft, watercraft or *auto;* or

   **c.** While it is being moved from an aircraft, watercraft or *auto* to the place where it is finally delivered;

but *loading or unloading* does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or *auto.*

**12.** *"Mobile equipment"* means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** Vehicles maintained for use solely on or next to premises you own or rent;

   **c.** Vehicles that travel on crawler-treads;

   **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers.

   **e.** Vehicles not described in a, b, c or d above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers.

   **f.** Vehicles not described in a, b, c, or d above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not *mobile equipment* but will be considered *autos:*

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning.

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**13.** *"Occurrence"* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** *"Personal and advertising injury"* means injury, including consequential *bodily injury,* arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **f.** The use of another's advertising idea in your *advertisement;* or

   **g.** Infringing upon another's copyright, trade dress or slogan in your *advertisement.*

**15.** *"Pollutants"* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

**16.** *Products-completed operations hazard:*

a. Includes all *bodily injury* and *property damage* occurring away from premises you own or rent and arising out of *your product* or *your work* except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, *your work* will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include *bodily injury* or *property damage* arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the *loading or unloading* of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. *"Property damage"* means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the *occurrence* that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. *"Suit"* means a civil proceeding in which damages because of *bodily injury, property damage or personal and advertising injury* to which this insurance applies are alleged. *Suit* includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. *"Temporary worker"* means a person who is furnished to you to substitute for a permanent *employee* on leave or to meet seasonal or short-term workload conditions.

20. *"Volunteer worker"* means a person who is not your *employee*, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. *"Your product:"*

a. Means:

(1) Any goods or products other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your product;* and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. *"Your work:"*

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your work;* and

(2) The providing of or failure to provide warnings or instructions.

**CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)**

CG-2187R(1-07)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

**A. Applicability Of The Provisions Of This Endorsement**

1. **The provisions of this endorsement will become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.**

   a. **The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or**

   b. **A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:**

      (1) **Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or**

      (2) **Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or**

      (3) **Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.**

2. **If the provisions of this endorsement become applicable, such provisions:**

   a. **Supersede any terrorism endorsement already endorsed to this policy that addresses *certified acts of terrorism* and/or *other acts of terrorism*, but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and**

   b. **Remain applicable unless we notify you of changes in these provisions, in response to federal law.**

3. **If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses *certified acts of terrorism* and/or *other acts of terrorism*, will continue in effect unless we notify you of changes to that endorsement in response to federal law.**

**B.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are shown in italics:

1. *"Terrorism"* means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or

(continued next page)

to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. *"Any injury or damage"* means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal and advertising injury, injury* or *environmental damage* as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for *any injury or damage* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism. Any injury or damage* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of *terrorism*:**

1. The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

3. The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determin-

ing whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs C5 or C6 are exceeded.

With respect to this Exclusion, Paragraphs C5 and C6 describe the threshold used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Part or Policy.

In the event of any incident of *terrorism* that is not subject to this Exclusion, coverage does not apply to *any injury or damage* that is otherwise excluded under this Coverage Part or Policy.

---

**MINNESOTA CHANGES - DUTIES CONDITION**

CG-2681F(11-02)

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

EMPLOYEE BENEFITS LIABILITY COVERAGE **CG 04 35**
LIMITED PRODUCT WITHDRAWAL EXPENSE ENDORSEMENT **CG 04 36**
PERSONAL INJURY LIABILITY ENDORSEMENT **CG 28 05**

The following is added to the Duties Condition:

The requirement to notify us will be satisfied by notifying our agent. Such notice may be written or oral.

**MINNESOTA CHANGES**

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART

COMMERCIAL CRIME COVERAGE PART

COMMERCIAL GENERAL LIABILITY COVERAGE PART

CONTRACTORS ERRORS AND OMISSIONS COVERAGE PART

DIRECTORS AND OFFICERS LIABILITY COVERAGE PART

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART

POLLUTION LIABILITY COVERAGE FORM

PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

1. The Cancellation Common Policy Condition is replaced by the following:

   **CANCELLATION**

   a. The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   b. We may cancel this policy by giving written notice to the First Named Insured and any agent. Notice will be delivered by first class mail to the First Named Insured at the last mailing address known to us. Notice of cancellation will state the effective date of cancellation and the policy period will end on that date.

   c. If this policy is a new policy and has been in effect for fewer than 90 days, we may cancel for any reason by giving written notice at least 10 days before the effective date of cancellation.

   d. If this policy has been in effect for 90 days or more, if it is a renewal of a policy, or if it is a policy issued for a term longer than one year, we may cancel only for one or more of the following reasons:

      (1) Nonpayment of premium;

      (2) Misrepresentation or fraud made by you or with your knowledge in obtaining the policy or in pursuing a claim under the policy;

      (3) Actions by you that substantially increase or change the risk insured;

      (4) Refusal by you to eliminate known conditions that increase the potential for loss after notification by us that the condition must be removed;

      (5) Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the contract;

   (6) Loss of reinsurance by us which provided coverage to us for a significant amount of the underlying risk insured. A notice of cancellation under this item shall advise you that you have 10 days from the date of receipt of the notice to appeal the cancellation to the Commissioner of Commerce. The commissioner will render a decision as to whether the cancellation is justified because of the loss of reinsurance within 30 business days after receipt of the appeal; or

   (7) A determination by the commissioner that the continuation of the policy could place us in violation of the Minnesota insurance laws.

   If we cancel for nonpayment of premium, we will give notice at least 10 days before the effective date of cancellation. The cancellation notice will contain the information regarding the amount of premium due and the due date and will state the effect of nonpayment by the due date. Cancellation will not be effective if payment of the amount due is made prior to the effective date of cancellation.

   If we cancel for other reasons, we will give notice at least 60 days before the effective date of cancellation. The notice of cancellation will state the reason for cancellation.

   e. If the policy is issued for a term longer than one year, we may cancel at anniversary of the effective date by giving notice at least 60 days before the anniversary date. The notice of cancellation will state the reason for cancellation.

   f. If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be computed pro rata. If the First Named Insured cancels, the refund will be computed at 90% of pro rata. The cancellation will be effective even if we have not made or offered a refund.

2. The following is added and supersedes any provision to the contrary.

   **NONRENEWAL**

   We may nonrenew this policy by giving written notice of nonrenewal to the First Named Insured and any agent at least 60 days before the expiration date. Notice will be delivered by first class mail to the First Named Insured at the last mailing address known to us.

   We need not mail or deliver this notice if you have:

   a. Obtained coverage elsewhere;

**b.** Accepted replacement coverage; or

**c.** Agreed not to renew this policy.

If the notice is not given at least 60 days before the date of expiration, the policy shall continue to be in effect 60 days after the notice of intent not to renew is received by the First Named Insured.

**3.** Unless other proof of notice is otherwise specifically required, proof of mailing of any notice shall be sufficient proof of notice. We may de-liver any notice instead of mailing it.

**4.** The Examination of Your Books and Records Common Policy Condition is replaced by the following:

EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to one year afterward.

## WAR LIABILITY EXCLUSION

CG-0062F(12-02)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **i.** under Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**i. War**

*Bodily injury* or *property damage,* however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage B -**

**Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**WAR**

*Personal and advertising injury,* however caused, arising, directly or indirectly, out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**C.** Exclusion **h.** under Paragraph **2., Exclusions** of **Section I - Coverage C - Medical Payments** does not apply. Medical payments due to war are now subject to Exclusion **g.** of Paragraph **2., Exclusions** of **Section I - Coverage C - Medical Payments** since *bodily injury* arising out of war is now excluded under Coverage **A.**

## ASBESTOS EXCLUSION

IL-7012(11-05)

This endorsement modifies insurance provided under the following:

BIS-PAK BUSINESS LIABILITY AND MEDICAL EXPENSE COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added:

**Asbestos**

This insurance does not apply to any *bodily injury* or *property damage* arising out of activities related to, but not limited to, manufacture, mining, storage, distribution, installation, sale, use, exposure to, service, testing for, repair, containment or removal of asbestos, asbestos fibers, asbestos dust, or products containing asbestos.

**LIMITED TERRORISM EXCLUSION (OTHER THAN CERTIFIED ACTS OF TERRORISM); CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

CG-2171R(12-02)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

*Any injury or damage* arising, directly or indirectly, out of an *other act of terrorism*. However, this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.**

and **2.** describe the thresholds used to measure the magnitude of an incident of an *other act of terrorism* and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

B. The following definitions are added:

1. For the purposes of this endorsement, *"any injury or damage"* means any injury or damage covered under any Coverage Part or Form to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal and advertising injury, injury* or *environmental damage* as may be defined in any applicable Coverage Part or Form.

2. *"Certified act of terrorism"* means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a *certified act of terrorism*:

   a. The act resulted in aggregate losses in excess of $5 million; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. *"Other act of terrorism"* means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002. However, *other act of terrorism* does not include an act which meets the criteria set forth in Paragraph **b.** of the definition of *certified act of terrorism* when such act resulted in aggregate losses of $5 million or less. Multiple incidents of an *other act of terrorism* which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leader-

ship shall be considered to be one incident.

**C.** In the event of an *other act of terrorism* that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part or Form.

**D.** With respect to any one or more *certified acts of terrorism,* we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

---

**ILLINOIS CHANGES**

CG-7117(6-06)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

CONTRACTORS ERRORS AND OMISSIONS COVERAGE PART

DIRECTORS AND OFFICERS LIABILITY COVERAGE PART

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

LIQUOR LIABILITY COVERAGE FORM

POLLUTION LIABILITY COVERAGE FORM

PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**1.** The Cancellation Common Policy Condition is replaced by the following:

**CANCELLATION**

**a.** The named insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing to the named insured and the agent or broker written notice stating the reason for cancellation. If we cancel:

(1) For nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

(2) For a reason other than nonpayment of premium, we will mail the notice at least:

(a) Thirty days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

(b) Sixty days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

**c.** If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

(1) Nonpayment of premium;

(2) The policy was obtained through a material misrepresentation;

(3) Any insured has violated any of the terms and conditions of the policy;

(4) The risk originally accepted has measurably increased;

(5) Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

(6) A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the named insured any premium refund due. If we cancel, the refund will be pro rata. If the named insured cancels, the refund will be computed at 90% of pro rata. The cancellation will be effective even if we have not made or offered a refund.

**2.** The following Condition is added and supersedes any provision to the contrary:

**NONRENEWAL**

If we decide not to renew or continue this policy, we will mail to the named insured and the agent or broker, and the *contractor,* written notice, stating the reason for nonrenewal, at least 60 days before the end of the policy period. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**3.** The following is added:

**MAILING OF NOTICES**

We will mail cancellation and nonrenewal notices to the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**NUCLEAR ENERGY LIABILITY EXCLUSION - BROAD FORM**

IL-0021F(11-85)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

**1.** The insurance does not apply:

**a.** Under any Liability Coverage to *bodily injury* or *property damage:*

(1) With respect to which an *insured* under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the *hazardous properties* of *nuclear material* and with respect to which:

(a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

(b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under any Medical Payments coverage, to expenses incurred with respect to *bodily injury* resulting from the *hazardous properties* of *nuclear material* and arising out of the operation of a *nuclear facility* by any person or organization.

**c.** Under any Liability Coverage, to *bodily injury* or *property damage* resulting from the *hazardous properties* of *nuclear material,* if:

(1) The *nuclear material:*

(a) Is at any *nuclear facility* owned by, or operated by or on behalf of, an insured; or

(b) Has been discharged or dispersed therefrom.

(2) The *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an *insured;* or

(3) The *bodily injury* or *property damage* arises out of the furnishing by an *insured* of services, materials, parts or equipment in connection with

the planning, construction, maintenance, operation or use of any *nuclear facility,* but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to *property damage* to such *nuclear facility* and any property thereat.

**2.** As used in this endorsement:

**a.** *"Hazardous properties"* include radioactive, toxic or explosive properties.

**b.** *"Nuclear material"* means *source material, special nuclear material* or *byproduct material.*

**c.** *"Source material," "special nuclear material"* and *"byproduct material"* have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**d.** *"Spent fuel"* means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor.*

**e.** *"Waste"* means any waste material:

(1) Containing *byproducts material* other than the tailings or *wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its *source material* content; and

(2) Resulting from the operation by any person or organization of any *nuclear facility* included under the first two paragraphs of the definition of *nuclear facility.*

**f.** *"Nuclear facility"* means:

(1) Any *nuclear reactor;*

(2) Any equipment or device designed or used for:

(a) Separating the isotopes of uranium or plutonium;

(b) Processing or utilizing *spent fuel;* or

(c) Handling, processing or packaging *waste.*

(3) Any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the *insured* at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of *waste;*

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**g.** *"Nuclear reactor"* means any apparatus designed or used to sustain nuclear fission in a self-supporting

(continued next page)

chain reaction or to contain a critical mass of fission-able material.

**h.** *"Property damage"* includes all forms of radioactive contamination of property.

## COMMON POLICY CONDITIONS

IL-0017F(11-98)

All Coverage Parts included in this policy are subject to the following conditions.

### A. CANCELLATION

**1.** The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least:

**a.** Ten days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** Thirty days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The First Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe or healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs 1 and 2 of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph 2 of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

### E. PREMIUMS

The First Named Insured shown in the Declarations:

**1.** Is responsible for the payment of all premiums; and

**2.** Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

## MINNESOTA CHANGES - CONTRACTUAL LIABILITY EXCLUSION AND SUPPLEMENTARY PAYMENTS

CG-0122F(7-98)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**1.** Paragraph 2b of Exclusions of Section I - Coverage A - Bodily Injury and Property Damage Liability is replaced by the following:

*Bodily injury* or *property damage* for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**a.** That the insured would have in the absence of the contract or agreement; or

**b.** Assumed in a contract or agreement that is an *insured contract,* provided the *bodily injury* or *property damage* occurs subsequent to the execution of the contract or agreement.

**2.** The Section I Supplementary Payments - Coverages A and B provision is replaced by the following:

**a.** We will pay, with respect to any claim we investigate or settle, or any *suit* against an insured we defend:

(1) All expenses we incur.

(2) Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

(4) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or *suit,* including actual loss of earnings up to $250 a day because of time off from work.

(5) All costs taxed against the insured in the *suit.*

(6) Prejudgment interest awarded against the insured on that part of the judgment we pay.

(7) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limits of Insurance.

**b.** If we defend an insured against a *suit* and an indemnitee of the insured is also named as a party to the *suit,* we will defend that indemnitee if all of the following conditions are met:

(1) The *suit* against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an *insured contract;*

(2) This insurance applies to such liability assumed by the insured;

(3) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same *insured contract;*

(4) The allegations in the *suit* and the information we know about the *occurrence* are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(5) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such *suit* and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(6) The indemnitee:

(a) Agrees in writing to:

(i) Cooperate with us in the investigation, settlement or defense of the *suit;*

(ii) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the *suit;*

(iii) Notify any other insurer whose coverage is available to the indemnitee; and

(iv) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(b) Provides us with written authorization to:

(i) Obtain records and other information related to the *suit;* and

(ii) Conduct and control the defense of the indemnitee in such *suit.*

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph f above, are no longer met.

**DEDUCTIBLE LIABILITY INSURANCE**                    CG-0300F(1-96)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**1.** Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule as applicable to such coverages.

**2.** You may select a deductible amount on either a per claim or a per *occurrence* basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule. The deductible amount stated in the Schedule applies as follows:

**a. Per Claim Basis** - If the deductible amount indicated in the Schedule is on a per claim basis, that deductible applies as follows:

(1) Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of *bodily injury;*

(2) Under Property Damage Liability Coverage, to all damages sustained by any one person because of *property damage;* or

(3) Under Bodily Injury Liability and Property Damage Liability Coverage combined, to all damages sustained by any one person because of:

(a) *Bodily injury;*

(b) *Property damage;* or

(c) *Bodily injury* and *property damage* combined;

as the result of any one *occurrence.*

If damages are claimed for care, loss of services or death resulting at any time from *bodily injury,* a separate deductible amount will be applied to each person making a claim for such damages.

With respect to *property damage,* person includes an organization.

**b. Per Occurrence Basis** - If the deductible amount indicated in the Schedule is on a per *occurrence* basis, that deductible amount applies as follows:

(1) Under Bodily Injury Liability Coverage, to all damages because of *bodily injury;*

(2) Under Property Damage Liability Coverage, to all damages because of *property damage;* or

(3) Under Bodily Injury Liability and Property Damage Liability Coverage combined, to all damages because of:

(a) *Bodily injury;*

(b) *Property damage;* or

(c) *Bodily injury* and *property damage* combined;

as the result of any one *occurrence,* regardless of the number of persons or organizations who sustain damages because of that *occurrence.*

With respect to *property damage,* person includes an organization.

**3.** The terms of this insurance, including those with respect to:

**a.** Our right and duty to defend the insured against any *suits* seeking those damages; and

**b.** Your duties in the event of an *occurrence,* claim or *suit;*

apply irrespective of the application of the deductible amount.

**4.** We may pay any part or all of the deductible amount to effect settlement of any claim or *suit* and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**SCHEDULE**

| Applicable Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | (per claim) | (per occurrence) |
| BODILY INJURY LIABILITY | $  2,000 | |
| PROPERTY DAMAGE LIABILITY | 2,000 | |

**Application of Endorsement**

Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all *bodily injury* and *property damage,* however caused.

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

CG-2147F(7-98)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** The following exclusion is added to paragraph 2 Exclusions, of Section I - Coverage A - Bodily Injury and Property Damage Liability:

This insurance does not apply to:

**1.** *Bodily injury* to:

**a.** A person arising out of any:

(1) Refusal to employ that person;

(2) Termination of that person's employment; or

(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of *bodily injury* to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**2.** The following exclusion is added to paragraph 2 Exclusions of Section I - Coverage B - Personal and Advertising Injury Liability:

This insurance does not apply to:

**1.** *Personal and advertising injury* to:

**a.** A person arising out of any:

(1) Refusal to employ that person;

(2) Termination of that person's employment; or

(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of *personal and advertising injury* to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

CG-2176R(11-02)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a *certified act of terrorism* that are awarded as punitive damages.

**B.** The following definition is added:

*"Certified act of terrorism"* means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a *certified act of terrorism:*

**1.** The act resulted in aggregate losses in excess of $5 million; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## FUNGI OR BACTERIA EXCLUSION

CG-2167F(4-02)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverage A - Bodily Injury and Property Damage Liability:

   **Fungi or Bacteria**

   a. *Bodily injury* or *property damage* which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any *fungi* or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, *fungi* or bacteria, by any insured or by any other person or entity.

   This exclusion does not apply to any *fungi* or bacteria that are, are on, or are contained in, a good or product intended for consumption.

2. The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverage B - Personal and Advertising Injury Liability:

   **Fungi or Bacteria**

   a. *Personal and advertising injury* which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any *fungi* or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

   b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, *fungi* or bacteria, by any insured or by any other person or entity.

3. The following definition is added to the Definitions Section:

   *"Fungi"* means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

---

## *ACUITY* ADVANTAGES - GENERAL LIABILITY

CG-7300(9-04)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. **Extended Non-Owned Watercraft**

   Exclusion g Exception (2)(a) of Coverage A - Bodily Injury and Property Damage Liability is replaced by the following:

   (a) Less than 51 feet long; and

2. **Increased Bail Bond Amount**

   The limit shown in paragraph 1b of Supplementary Payments - Coverages A and B is increased to $750.

3. **Increased Reasonable Expenses Incurred by the Insured**

   The limit shown in paragraph 1d of Supplementary Payments - Coverages A and B is increased to $300.

4. **Newly Acquired Organizations**

   Item 4a of Section II - Who Is An Insured is replaced by the following:

   a. Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

5. **Knowledge of Claim or Suit**

   The following is added to Paragraph 2, Duties in the Event of Occurrence, Offense, Claim or Suit of Section IV - Commercial General Liability Conditions:

   Knowledge of an *occurrence,* claim or *suit* by your agent, servant or *employee* shall not in itself constitute knowledge of the Named Insured unless an officer of the Named Insured has received such notice from the agent, servant or *employee.*

## EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

CG-0067F(3-05)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Distribution of Material in Violation of Statutes**

*Bodily injury* or *property damage* arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Distribution of Material in Violation of Statutes**

*Personal and advertising injury* arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

CG-2011F(11-85)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Section II - Who Is an Insured is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any *occurrence* which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

### SCHEDULE

| Person or Organization (Name and Address) | Designation of Premises (Part Leased to You) |
|---|---|
| TRAMMELL CROW COMPANY M & J WILKOW LTD 203 HCI/NLS LIMITED 9525 BRYN MAWR AVE 730 ROSEMONT IL 60018 | ALL LOCATIONS |
| INTERPARK GENERAL ELECTRIC CAPITAL CORP GE CAPITAL REAL 200 N LASALLE ST 1400 CHICAGO IL 60601 | ALL LOCATIONS |

## COMMERCIAL GENERAL LIABILITY - AMENDMENT - MINNESOTA

CG-7066(7-98)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**1.** Item 10, Your Right to Claim and Occurrence Information, of Section IV - Commercial General Liability Conditions of form CG-7089 is changed as follows:

**a.** If we elect not to renew this Coverage Part, we will send the claim and *occurrence* information indicated no less than 20 days prior to the effective date of the policy termination.

**b.** If we cancel the policy for nonpayment of premium, we will send the claim and *occurrence* information no less than 10 days after the effective date of the policy termination.

**c.** Cancellation or termination will still be effective under a or b even if we fail to provide the information indicated.

**d.** We will also provide the claim and *occurrence* information if we receive a request from the First Named Insured. In this case, we will provide this information within 30 days of receipt of the request.

**2.** The following is added to the Transfer of Rights of Recovery Against Others to Us Condition:

Our rights do not apply against any person or organization insured under this or any other Coverage Part we issue with respect to the same *occurrence*.

## ILLINOIS CHANGES

CG-7141(1-96)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**1. Section I - Coverages**

Paragraph b Contractual Liability, of Item 2 Exclusions, is replaced by the following:

*Bodily injury* or *property damage* for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an *insured contract,* provided the *bodily injury* or

*property damage* occurs subsequent to the execution of the contract or agreement; or

(2) That the insured would have in the absence of the contract or agreement.

**2.** The second paragraph of 4b under Other Insurance is replaced by the following:

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or *suit* that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

IL-0985R(1-06)

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for

terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.



**COMMERCIAL GENERAL LIABILITY
CHANGES**

First Named Insured and Address:

ZEAG USA INC
203 N LASALLE STE M5
CHICAGO IL 60601

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:   L52851

Change Effective Date:   08-13-07

**PREMIUM SUMMARY**

No Additional or Return Premium
Direct Billed

**CHANGES:**

CHANGED MAILING ADDRESS TO 203 N LASALLE STE M5 CHICAGO IL 60601



**COMMERCIAL GENERAL LIABILITY
COVERAGE PART**

**Amended Declarations**

First Named Insured and Address:

ZEAG USA INC
203 N LASALLE STE M5
CHICAGO IL 60601

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:  L52851

Policy Period:  Effective Date:  08-13-07

Expiration Date:  01-03-08

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

**COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART**

| Form Number | Form Title | Premium |
|---|---|---|
| CG-0001R (08-06) | Commercial General Liability Coverage Form . . . . . . . . . . . . . . . . . . . . . .$ | |
| CG-0122F (07-98) | Minnesota Changes - Contractual Liab Exclusion and Supplementary Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-0300F (01-96) | Deductible Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2147F (07-98) | Employment - Related Practices Exclusion . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7066 (07-98) | Commercial General Liability - Amendment - Minnesota . . . . . . . . . . . . . . | |
| IL-0017F (11-98) | Common Policy Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-0021F (11-85) | Nuclear Energy Liability Exclusion - Broad Form . . . . . . . . . . . . . . . . . . . . | |
| IL-7012 (11-05) | Asbestos Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-7027 (01-02) | Minnesota Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2167F (04-02) | Fungi or Bacteria Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2171R (12-02) | Limited Terrorism Exclusion (Other than Cert Acts); Cap on Losses . . . . . | 259.00 |
| IL-0985R (01-06) | Disclosure Pursuant to Terrorism Risk Insurance Act of 2002 . . . . . . . . . . | |
| CG-0062F (12-02) | War Liability Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2681F (11-02) | Minnesota Changes - Duties Condition . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7300 (09-04) | ACUITY Advantages - General Liability . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-0067F (03-05) | Exclusion - Violation of Statutes that Govern E-mails, Fax, Phone Calls or Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2187R (01-07) | Conditional Exclusion of Terrorism (Relating to Disposition of Federal Act) | |
| CG-2011F (11-85) | Additional Insured - Managers or Lessors of Premises . . . . . . . . . . . . . . . | 1,083.00 |
| CG-7117 (06-06) | Illinois Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-7141 (01-96) | Illinois Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CG-2176R (11-02) | Exclusion of Punitive Damages Related to a Certified Act of Terrorism . . . | |

**Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$   1,342.00**

Page 2
Policy Number:        L52851
Effective Date:        08-13-07

## PREMIUM SUMMARY

Advance Schedule Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $    25,836.00

Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,342.00

**Total Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    **27,178.00**

The Total Advance Premium shown above is based on the exposures you told us you would have when this coverage part began. We will audit this coverage part in accordance with Section IV - Conditions, item 5 Premium Audit at the close of the audit period.

## LIMITS OF INSURANCE

General Aggregate Limit (Other Than Products-Completed Operations) . . . . . . . . . . . . . .$    2,000,000

Products-Completed Operations Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

Personal and Advertising Injury Limit (Any One Person or Organization) . . . . . . . . . . . . .    1,000,000

Each Occurrence Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

Damage to Premises Rented to You Limit (Any One Premises) . . . . . . . . . . . . . . . . . . . . .    100,000

Medical Expense Limit (Any One Person) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000

*ACUITY* Advantages - General Liability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . See CG-7300

## SCHEDULE OF LIABILITY CLASSIFICATIONS

| Unit No. | Classification Description | Class Code | Premium Basis[1] | | Rates Premises | Products | Advance Premium |
|---|---|---|---|---|---|---|---|
| **Minnesota** | | | | | | | |
| 005 | PARKING SYSTEMS - INSTALLATION SERVICE OR REPAIR | 44444 | 225,000 | P | 16.909 | 24.316 | $    9,276.00 |
| 006 | PARKING SYSTEMS EQUIPMENT DISTRIBUTORS | 44444 | 1,625,000 | G | .377 | 1.325 | 2,766.00 |
| **Illinois** | | | | | | | |
| 007 | PARKING SYSTEMS - INSTALLATION SERVICE OR REPAIR | 44444 | 225,000 | P | 23.455 | 23.652 | 10,599.00 |
| 008 | PARKING SYSTEMS EQUIPMENT DISTRIBUTORS | 44444 | 1,625,000 | G | .700 | 1.266 | 3,195.00 |
| | **Advance Schedule Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | | | | | **25,836.00** |

## AUDIT PERIOD

Annual

Page 3

Policy Number:        L52851
Effective Date:       08-13-07

**FIRST NAMED INSURED IS:**

ORGANIZATION OTHER THAN PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY
COMPANY

**ADDITIONAL NAMED INSUREDS**

WHO IS AN INSURED (Section II) includes the following Additional Named Insureds:

NONE

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

4825 GLUMACK DR
SAINT PAUL, MN 55111

203 N LASALLE ST
CHICAGO, IL 60601

10,000 W O'HARA BLVD
CHICAGO, IL 60602

# EXHIBIT D



**COMMERCIAL UMBRELLA
CHANGES**

First Named Insured and Address:

**ZEAG USA INC**
4825 GLUMACK DR
SAINT PAUL MN 55111

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:  L52851

Change Effective Date:  03-02-07

**PREMIUM SUMMARY**

Additional Premium Applied to Your Balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    4,777.00
Direct Billed

**CHANGES:**

THE COMMERCIAL UMBRELLA PREMIUM MAY HAVE INCREASED OR DECREASED
DUE TO A REQUESTED CHANGE IN THE UNDERLYING COVERAGES.
ADDED COMMERCIAL UMBRELLA COVERAGE PART



IL-7007 (6-01)                    Policyholder - Original                    SO 01 04/20/07



**COMMERCIAL UMBRELLA
COVERAGE PART**

**Amended Declarations**

First Named Insured and Address:

ZEAG USA INC
4825 GLUMACK DR
SAINT PAUL MN 55111

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:  L52851

Policy Period:  Effective Date:       03-02-07

Expiration Date:      01-03-08

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

**COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART**

| Form Number | Form Title | Premium |
|---|---|---|
| CU-7072 (01-07) | Conditional Exclusion of Terrorism (Relating to Disposition of Fed. Act) . . $ | |
| CU-7008 (11-05) | Asbestos Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7010 (03-03) | Nuclear Energy Liability Exclusion Endorsement . . . . . . . . . . . . . . . . . . . . | |
| CU-7031 (03-03) | Minnesota Amendatory Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-0985R (01-06) | Disclosure Pursuant to Terrorism Risk Insurance Act of 2002 . . . . . . . . . | |
| CU-7054 (03-03) | Fungi or Bacteria Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7037 (05-05) | Commercial Excess Liability Coverage Form . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7067 (03-03) | War Liability Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7062 (03-03) | Limited Terrorism Exclusion (Other than Cert Acts); Cap on Losses . . . . . | 56.00 |
| CU-7038 (06-06) | Illinois Amendatory Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7066 (03-03) | Exclusion of Punitive Damages Related to a Certified Act of Terrorism . . . | |

| | | |
|---|---|---|
| **Advance Endorsement Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | **56.00** |

**PREMIUM SUMMARY**

| | | |
|---|---|---|
| Advance Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | 5,624.00 |
| Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 56.00 |
| **Total Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ | | **5,680.00** |

**ADDITIONAL NAMED INSUREDS**

WHO IS AN INSURED includes the following Additional Named Insureds:

NONE

Page 2
Policy Number: L52851
Effective Date: 03-02-07

## LIMITS OF INSURANCE

General Aggregate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$  1,000,000

Products-Completed Operations Aggregate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,000,000 .

Each Occurrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,000,000

## PREMIUM COMPUTATION

Not Subject to Audit

Estimated Advance Premium  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$  5,624.00

## SCHEDULE OF UNDERLYING INSURANCE - GENERAL LIABILITY

Policy Number:   CG-L52851
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:   03-02-07 To 01-03-08

Occurrence Coverage

**Limits or Amounts of Insurance**

General Aggregate Limit (Other Than Products-Completed Operations) . . . . . . . . . . . . .$  2,000,000

Products-Completed Operations Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,000,000

Personal and Advertising Injury Limit (Any One Person or Organization) . . . . . . . . . . . . .  1,000,000

Each Occurrence Limit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,000,000

## SCHEDULE OF UNDERLYING INSURANCE - AUTOMOBILE LIABILITY

Policy Number:   CA-L52851
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:   03-02-07 To 01-03-08

**Limits or Amounts of Insurance**

Bodily Injury and Property Damage Combined Single Limit (Each Accident) . . . . . . . . . .$  1,000,000

## COMMERCIAL EXCESS LIABILITY COVERAGE FORM

This policy contains both a Products-Completed Operations Aggregate Limit and a General Aggregate Limit of Insurance. These are described in Section II - Limit of Insurance.

Other provisions in this policy restrict coverage. Read the entire policy and any *underlying insurance* carefully to determine rights, duties and what is covered and not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under any *underlying insur-*

*ance.* The words "we," "us" and "our" refer to the Company providing this insurance.

The words "this insurance" mean the liability insurance provided under this policy.

The word "insured" means any person or organization qualifying as such under any *underlying insurance.*

Other words and phrases that appear in italics have special meaning. Refer to Section IV - Definitions of this policy.

## SECTION I - COVERAGES

**1. Insuring Agreement**

**a.** We will pay those sums, in excess of the amount payable under the terms of any *underlying insurance,* that the insured becomes legally obligated to pay as damages because of *injury* or damage to which this insurance applies, provided that the *underlying insurance* also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.

We will also pay those sums that the insured becomes legally obligated to pay as damages because of *injury* or damage to which the insurance provided under the Coverage Extension applies as set forth in paragraph 4 below.

**b.** We have the right to participate in the investigation or settlement of claims or the defense of the insured against suits seeking damages because of *injury* or damage to which this insurance may apply. We have a duty to investigate or settle such claims or to defend the insured against such suits when the applicable Limit of Insurance of the *underlying insurance* has been used up by payment of judgments, settlements and any cost or expense subject to such limit.

We will have the right and duty to participate in the investigation and settlement of claims or the defense of the insured against suits seeking damages because of *injury* or damage to which the insurance provided under the Coverage Extension may apply.

This right or duty to defend is limited as set forth in paragraph 3 below.

However, we will have no duty to defend the insured against any suit seeking damages for *injury* or damage to which this insurance does not apply.

**c.** The amount we will pay for damages is limited as described in Section II - Limit of Insurance.

**d.** This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the *underlying insurance,* except:

(1) We have no obligation under this insurance with respect to any claim or suit that is settled without our consent; and

(2) With respect to any provisions to the contrary contained in this insurance.

**2. Exclusions**

The exclusions that apply to the *underlying insurance* apply to this insurance. Also, this insurance does not apply to damages because of:

**a.** *Injury* or damage to premises rented to you or temporarily occupied by you with permission of the owner.

**b.** Any duty to pay expenses under any medical payments coverage.

**c.** Any duty to reimburse an insurer as provided by the terms of the Endorsement For Motor Carrier Policies of Insurance For Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980 or under the terms of any similar endorsement required by Federal or state statute.

**d.** Any duty payable only because of the attachment of the Endorsement For Motor Carrier Policies of Insurance For Public Liability or any similar endorsement required by Federal or state statute.

**e.** Any duty imposed by law under any automobile no-fault, uninsured motorist, underinsured motorist, workers' compensation, disability benefits or unemployment compensation law or any similar law.

**f.** Any duty imposed by law under the following:

(1) Section 130, Civil Liability, of Title I (Truth in Lending Act) of the Consumer Credit Protection Act (Public Law

90-321; 82 Stat. 146 et. seq.);

(2) Title IV (Odometer Requirements) of the Motor Vehicle Information and Cost Savings Act (Public Law 92-513; 86 Stat. 961); or

(3) Employee's Retirement Income Security Act (E.R.I.S.A.) of 1974 as now or hereafter amended.

**g.** *Injury* or damage to personal property in the care, custody or control of the insured.

This exclusion does not apply to liability assumed under a sidetrack agreement.

**h.** *Injury* or damage sustained by an employee, former employee, prospective employee or their beneficiaries or legal representatives and caused by any negligent act, error or omission of the insured, or any other person for whose acts the insured is legally liable, in the administration of any employee benefit program. Administration includes giving counsel to employees, interpreting, handling of employee records, and effecting enrollment, termination or cancellation of employees.

**i.** Any obligation to pay any claim or claims made against you or any of your officers, directors or trustees, individually or collectively, by reason of a wrongful act in their respective capacities as officers, directors or trustees.

As used in this exclusion, "wrongful act" means any actual or alleged error, misstatement or misleading statement, act or omission, or neglect or breach of duty made or committed by your directors, officers or trustees.

**j.** Any obligation arising out of an act, error or omission of an insured:

(1) While performing the duties of an insurance agent in your garage operations; or

(2) In your garage operations as a result of title paper preparation.

As used in this exclusion:

(1) "Insurance agent" means a person or organization who is duly licensed as an insurance agent by the regulatory authority of the state in which the insured's principal place of business is located.

(2) "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. Garage operations includes the ownership, maintenance or use of the autos indicated in Section I of the Garage Coverage Form as cov-

ered autos. Garage operations also includes all operations necessary or incidental to a garage business.

(3) "Title paper preparation" means the preparation of official title papers for registering an auto sold by you. This includes the designation of a lienholder who holds a financial interest in the auto.

(4) "Auto" means a land motor vehicle, trailer or semitrailer.

**k.** Any obligation imposed due to the application of any statute permitting a customer to return an auto sold by an insured, if the auto fails to perform satisfactorily.

As used in this exclusion, "auto" means a land motor vehicle, trailer or semitrailer.

**l.** *Injury* or damage your customer becomes legally obligated to pay which arise out of the use of your covered auto. This exclusion applies only if your business is shown in the Declarations of the *underlying insurance* as an auto dealership.

However, if your customer becomes legally obligated to pay for *injury* or damage which arise out of their use of your covered auto and if there is:

(1) No other valid and collectible insurance (whether primary, excess or contingent) available to your customer, we will pay up to the compulsory or financial responsibility law limits where the covered auto is principally garaged.

(2) Other valid and collectible insurance (whether primary, excess or contingent) available to the customer but it is less than the compulsory or financial responsibility law limits where the covered auto is principally garaged, we will pay only for the amount by which the compulsory or financial responsibility law limits exceed the limits of the other insurance.

**3. Investigation or Settlement of Claims or Defense of Insured Against Suits**

**a.** When we have the duty to defend, we will pay for all *defense expense* once our duty to defend begins. We may investigate any claim or suit.

If we exercise our right to defend when there is no duty, we will pay only that *defense expense* we incur.

If we provide a defense, we may investigate any claim or suit at our discretion. We may settle such claim or suit within the Limit of Insurance available at the time of the settlement.

**b.** Our right or duty to defend ends when we

have used up the Limits of Insurance available in the payment of any judgments or settlements as provided under Section II - Limit of Insurance. This applies both to claims and suits pending at the time and those filed thereafter.

**c.** When we control the investigation or settlement of a claim or the defense of the insured against a suit, we will pay for the *defense expense.* If by mutual agreement or court order the insured assumes control before the applicable Limit of Insurance available is used up, we will reimburse the insured for reasonable *defense expense.*

**d.** As soon as the Limit of Insurance available is used up, you will then arrange to assume control of the investigation or settlement of all such claims or the defense of you or any other insured against such suits when our right or duty to investigate, settle or defend them ends.

**e.** We will assist the insured in the transfer of control of the investigation or settlement of claims or the defense of the insured against suits under c or d above. Until such transfer is completed, we will take on behalf of any insured those steps that we think proper:

(1) To avoid a default in any claim or suit; or

(2) To the continued investigation or settle-

ment of a claim or defense of the insured against a suit.

You agree that if we take such steps:

(1) We do not waive or give up any of our rights under this insurance; and

(2) You will reimburse us for any *defense expense* that arises out of such steps if the applicable Limit of Insurance available has been used up.

**f.** Any payment for *defense expense* will not reduce the Limits of Insurance.

**4. Coverage Extension**

**a.** The terms of this policy are extended as follows:

If *underlying insurance* provides coverage for the use of watercraft you do not own, in addition to watercraft ashore on premises you own or rent, the coverage provided by this policy is extended to cover any watercraft you do not own that is:

(1) Less than 75 feet long; and

(2) Not being used to carry persons or property for a charge;

even if these nonowned watercraft are not insured in the *underlying insurance.*

**b.** We will only pay for damages up to the limits of insurance.

## SECTION II - LIMIT OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below define the most we will pay under the terms of this insurance regardless of the number of:

**a.** Insureds;

**b.** Claims made or suits brought;

**c.** Persons or organizations making claims or bringing suits.

2. The General Aggregate Limit is the most we will pay for all damages under Section I - Coverages, other than damages arising out of:

**a.** The *products-completed operations hazard;* or

**b.** The ownership, operation, maintenance, use, loading or unloading, or entrustment to others, of an auto.

The General Aggregate Limit applies separately to:

**a.** Each location owned by or rented to you. A location is a premises involving the same or connecting lots, or a premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad; and

**b.** Each of your projects away from a location owned by or rented to you.

Each payment we make for such damages reduces by the amount of the payment, the General Aggregate Limit. This reduced limit will then be the Limit of Insurance available for further damages of these kinds.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Section I - Coverages because of damages arising out of the *products-completed operations hazard.* Each payment we make for such damages reduces, by the amount of the payment, the Products-Completed Operations Aggregate Limit. This reduced limit will then be the Limit of Insurance available for further damages of these kinds.

4. Subject to 2 and 3 above, or with respect to *injury* or damage arising out of the ownership, operation, maintenance, use, loading or unloading, or entrustment to others of an auto, the Each Occurrence Limit is the most we will pay for the sum of damages under Section I - Coverages because of all *injury* and damage arising out of any one *occurrence.*

5. The limits of this policy apply separately to

each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limit of Insurance.

## SECTION III - CONDITIONS

We have no duty to provide coverage under this policy unless you and any other involved insured have fully complied with the Conditions contained in this policy and those contained in any *underlying insurance.*

If any of the following conditions are contrary to Conditions contained in the *underlying insurance,* the provisions contained in this policy apply.

1. **Appeals**

   In the event the *underlying insurer* elects not to appeal a judgment in excess of the limits of the *underlying insurance,* we may elect to make such appeal. If we so elect, we shall be liable, in addition to the applicable Limit of Insurance for all *defense expenses* we incur.

2. **Bankruptcy of Underlying Insurer**

   In the event of bankruptcy or insolvency of any *underlying insurer,* this policy shall not replace such *underlying insurance.* This policy applies as if the *underlying insurance* was valid and collectible.

3. **Duties in the Event of Occurrence, Claim or Suit**

   a. You must see to it that we are notified as soon as practicable of an *occurrence* or offense which may result in a claim. To the extent possible notice should include:

      (1) How, when and where the *occurrence* or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any *injury* or damage arising out of the *occurrence* or offense.

   b. If a claim or suit is received by any insured you must:

      (1) Immediately record the specifics of the claim or suit and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or a suit;

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or the defense of the insured against the suit;

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of *injury* or damage to which this insurance may also apply; and

      (5) Notify us immediately of any judgment or settlement of any claim or suit brought against any insured.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

4. **Maintenance of Underlying Insurance**

   a. You agree to maintain the *underlying insurance* in full force and effect during the term of this policy. You agree to inform us within 10 days of any replacement of that *underlying insurance* by the same or another company. If there is any change in the replacement *underlying policy* in hazard, policy limits or coverage, including any terms, conditions and endorsements, we will only be liable under this insurance to the same extent as if there had been no change in, or replacement of, *underlying insurance.*

   b. In the event that any *underlying insurance* is cancelled or not renewed and not replaced, you must notify us within 10 days. We will not be liable under this insurance for more than we would have been liable if that *underlying insurance* had not terminated if you do not request cancellation of this policy effective the same date that the *underlying insurance* was cancelled.

   c. Reduction or exhaustion of the *aggregate limit* of any *underlying insurance* by payments for judgments or settlements will not be a failure to maintain *underlying insurance* in full force and effect.

   d. No statement contained in this Condition limits our right to cancel or not renew this policy.

5. **Other Insurance**

   This insurance is excess over any other valid and collectible insurance whether primary, ex-

cess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

**6. Policy Period**

This insurance will respond to *injury* or damage that occurs, or arises from an offense committed, during the policy period of this insurance shown in the Declarations.

## SECTION IV - DEFINITIONS

1. *"Aggregate limit"* means the maximum amount stated in the policy for which the insurer will be liable, regardless of the number of covered claims.

2. *"Defense expense"* means payments allocated to the investigation or settlement of a specific claim or the defense of the insured against a specific suit, including:

   **a.** Attorney fees and all other litigation expenses.

   **b.** The cost of bonds to appeal a judgment or award in our defense of the insured against any suit.

   **c.** Up to $250 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which bodily injury liability coverage provided by *underlying insurance* applies.

   **d.** The cost of bonds to release attachments. This is only for bond amounts within the Limit of Insurance available.

   **e.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or settlement of the claim or the defense of the insured against the suit. This includes actual loss of earnings up to $100 a day because of time off from work.

   **f.** Cost taxed against the insured in the suit.

   **g.** Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of Section II - Limits of Insurance.

   *Defense expense* does not include:

   **a.** Salaries and expenses of our employees or the insured's employees, other than:

      (1) That portion of our employed attorneys' fees, salaries and expenses allocated to a specific claim or suit; and

      (2) The expenses described in e above.

   **b.** Fees and expenses of independent adjusters we hire.

3. *"Injury"* means bodily injury, property damage, personal injury or advertising injury as defined in the *underlying insurance*.

4. *"Occurrence"* means:

   **a.** With respect to bodily injury to persons other than your employees and property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions;

   **b.** With respect to bodily injury to your employees arising out of and in the course of their employment by you, the accident or disease which causes the bodily injury; and

   **c.** With respect to offenses committed by the insured resulting in personal injury or advertising injury, all such injury sustained by any one person or organization.

5. *"Occurrence limit"* means any specific limit, other than an *aggregate limit*, applicable to any *underlying insurance*, regardless of whether such limit is subject to an *aggregate limit* in the *underlying policy*.

6. *"Products-completed operations hazard"*:

   **a.** Includes all *injury* occurring away from premises you own or rent and arising out of *your product* or *your work* except:

      (1) Personal injury or advertising injury as defined in the *underlying insurance;*

      (2) Products that are still in your physical possession; or

      (3) Work that has not yet been completed or abandoned. However, *your work* will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed;

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   **b.** Does not include *injury* arising out of:

      (1) The transportation of property, unless

the *injury* or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the loading or unloading of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment, or abandoned or unused materials; or

(3) Products or operations for which the classification in the General Liability *underlying policy* or in our General Liability manual or rules includes products or completed operations.

7. *"Underlying insurance"* means the liability insurance coverage provided under policies shown in the Schedule of Underlying Insurance in the Declarations, for the limits and periods indicated. It includes any policies issued to replace those policies during the term of this insurance, provided that you have notified us within 10 days of the replacement, and the replacement policies provide:

   **a.** At least the same policy limits;

   **b.** The same hazards insured against, except as modified by general program revisions; and

   **c.** The same coverage, including all terms, conditions and endorsements.

8. *"Underlying insurer"* means any insurer who issues a policy of *underlying insurance.*

9. *"Underlying policy"* means a policy providing *underlying insurance.*

10. *"Your product"* means:

   **a.** Any goods or products other than real prop-

erty, manufactured, sold, handled, distributed or disposed of by:

   (1) You;

   (2) Others trading under your name; or

   (3) A person or organization whose business or assets you have acquired; and

   **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

*Your product* includes:

   **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your product;* and

   **b.** The providing of or failure to provide warnings or instructions.

*Your product* does not include vending machines or other property rented to or located for the use of others but not sold.

11. *"Your work"* means:

   **a.** Work or operations performed by you or on your behalf; and

   **b.** Materials, parts or equipment furnished in connection with such work or operations.

*Your work* includes:

   **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your work;* and

   **b.** The providing of or failure to provide warnings or instructions.

**CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)**    CU-7072(1-07)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

A. **Applicability Of The Provisions Of This Endorsement**

1. **The provisions of this endorsement will become applicable commencing on the date when any one or more of the following first occurs. But if your policy (meaning the policy period in which this endorsement applies) begins after such date, then the provisions of this endorsement become applicable on the date your policy begins.**

   a. **The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Form; or**

   b. **A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:**

      (1) **Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or**

      (2) **Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or**

      (3) **Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.**

2. **If the provisions of this endorsement become applicable, such provisions:**

   a. **Supersede any terrorism endorsement already endorsed to this policy that addresses *certified acts of terrorism* and/or *other acts of terrorism*, but only with respect to an incident(s) of terrorism (however defined) which results in injury or dam-**age that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and**

   b. **Remain applicable unless we notify you of changes in these provisions, in response to federal law.**

3. **If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses *certified acts of terrorism* and/or *other acts of terrorism*, will continue in effect unless we notify you of changes to that endorsement in response to federal law.**

B. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are shown in italics:

1. *"Terrorism"* means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. *"Any injury or damage"* means any injury or damage covered under any Coverage Form

(continued next page)

or underlying insurance to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal and advertising injury, injury* or *environmental damage* as may be defined in any applicable Coverage Form or underlying insurance.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for *any injury or damage* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism. Any injury or damage* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of** *terrorism:*

1. The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

3. The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

    a. Physical injury that involves a substantial risk of death; or

    b. Protracted and obvious physical disfigurement; or

    c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs C5 or C6 are exceeded.

With respect to this Exclusion, Paragraphs C5 and C6 describe the threshold used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Form.

In the event of any incident of *terrorism* that is not subject to this Exclusion, coverage does not apply to *any injury or damage* that is otherwise excluded under this Coverage Form.

---

**DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT**                    IL-0985R(1-06)

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

A. **Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the policy Declarations.

B. **Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

**LIMITED TERRORISM EXCLUSION (OTHER THAN CERTIFIED ACTS OF TERRORISM); CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

CU-7062(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

*Any injury or damage* arising, directly or indirectly, out of an *other act of terrorism.* However, this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   **a.** Physical injury that involves a substantial risk of death; or

   **b.** Protracted and obvious physical disfigurement; or

   **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an *other act of terrorism* and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

1. For the purposes of this endorsement, *"any*

*injury or damage"* means any injury or damage covered under any Coverage Part or Form, Policy or underlying insurance to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal and advertising injury, injury* or *environmental damage* as may be defined in any applicable Coverage Part or Form, Policy or underlying insurance.

2. *"Certified act of terrorism"* means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a *certified act of terrorism:*

   **a.** The act resulted in aggregate losses in excess of $5 million; and

   **b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. *"Other act of terrorism"* means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002. However, *other act of terrorism* does not include an act which meets the criteria set forth in Paragraph **b.** of the definition of *certified act of terrorism* when such act resulted in aggregate losses of $5 million or less. Multiple incidents of an *other act of terrorism* which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of an *other act of terrorism* that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Policy.

D. With respect to any one or more *certified acts of terrorism*, we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

## ILLINOIS AMENDATORY ENDORSEMENT

CU-7038(6-06)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The following is added to Section III - Conditions:

**Cancellation**

a. The First Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

b. We may cancel this policy by mailing to the Named Insured and the agent or broker, written notice stating the reason for cancellation. If we cancel:

   (1) For nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   (2) For a reason other than nonpayment of premium, we will mail the notice at least:

      (a) Thirty days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      (b) Sixty days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

c. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   (1) Nonpayment of premium;

   (2) The policy was obtained through a material misrepresentation;

   (3) Any insured has violated any of the terms and conditions of the policy;

   (4) The risk originally accepted has measurably increased;

   (5) Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   (6) A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

e. If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**Nonrenewal**

a. If we decide not to renew or continue this policy, we will mail to the Named Insured, and the agent or broker written notice, stating the reason for nonrenewal at least:

   (1) Thirty days before the expiration date if the First Named Insured:

      (a) Has at least 25 full-time employees at the time this policy was written and procures the insurance of any risk, other than life, accident and health, and annuity contracts, by use of the services of a full-time employee acting as an insurance manager or buyer; or

      (b) Has aggregate annual premiums for all property and casualty insurance on all risks of at least $50,000.

   (2) Sixty days before the expiration date for any First Named Insured other than those listed in (1) above.

b. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

   If we fail to mail proper written notice of nonrenewal and you obtain other insurance, this policy will end on the effective date of that insurance.

**Mailing of Notices**

We will mail all cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**   CU-7010(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

1. This insurance does not apply to:

   a. Any claim or accident:

      (1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the *hazardous properties* of *nuclear material* and with respect to which:

         (a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

         (b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

   b. Any claim or accident resulting from the *hazardous properties* of *nuclear material*, if:

      (1) The *nuclear material*:

         (a) Is at any *nuclear facility* owned by, or operated by or on behalf of, an insured; or

         (b) Has been discharged or dispersed therefrom;

      (2) The *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (3) The claim or accident arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any *nuclear facility*, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to *property damage* to such *nuclear facility* and any property thereat.

2. As used in this endorsement:

   a. *"Hazardous properties"* include radioactive, toxic or explosive properties.

   b. *"Nuclear material"* means *source material, special nuclear material* or *by-product material.*

   c. *"Source material," "special nuclear material"* and *"by-product material"* have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   d. *"Spent fuel"* means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor.*

   e. *"Waste"* means any waste material:

      (1) Containing *by-products material* other than the tailings or *wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its *source material* content; and

      (2) Resulting from the operation by any person or organization of any *nuclear facility* included under the first two paragraphs of the definition of *nuclear facility.*

   f. *"Nuclear facility"* means:

      (1) Any *nuclear reactor;*

      (2) Any equipment or device designed or used for:

         (a) Separating the isotopes of uranium or plutonium;

         (b) Processing or utilizing *spent fuel;* or

         (c) Handling, processing or packaging *waste;*

      (3) Any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

      (4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of *waste;*

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(continued next page)

g. *"Nuclear reactor"* means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

h. *"Property damage"* includes all forms of radioactive contamination of property.

## EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

CU-7066(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a *certified act of terrorism* that are awarded as punitive damages.

B. The following definition is added:

*"Certified act of terrorism"* means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a *certified act of terrorism.*

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## FUNGI OR BACTERIA EXCLUSION

CU-7054(3-03)

The endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

1. The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverages:

a. *Injury* or damage which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any *fungi* or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, *fungi* or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any *fungi* or bacteria that are, are on, or are contained in, a good or product intended for consumption.

2. The following definition is added to the Definitions Section:

*"Fungi"* means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

## MINNESOTA AMENDATORY ENDORSEMENT

CU-7031(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The definition of *defense expense* in Section V - Definitions, also includes prejudgment interest awarded against the insured on that part of the judgment we pay.

**ASBESTOS EXCLUSION**

CU-7008(11-05)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The following exclusion is added:

**Asbestos**

1. This insurance does not apply to *injury,* including but not limited to, physical or mental injury, mental anguish or shock, sickness, disease, occupational disease, disability or death, or damage to property arising out of activities related to, but not limited to, manufacture, mining, storage, distribution, installation, sale, use, exposure to, service, testing for, repair, containment or removal of asbestos, asbestos fibers, asbestos dust, or products containing asbestos.

2. The following definition applies:

   *"Injury"* means bodily injury or property damage as defined in the *underlying insurance.*

**WAR LIABILITY EXCLUSION**

CU-7067(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The following exclusion is added:

This insurance does not apply to:

*Injury* or damage, however caused, arising, directly or indirectly, out of:

1. War, including undeclared or civil war; or

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.



**COMMERCIAL UMBRELLA
CHANGES**

First Named Insured and Address:

ZEAG USA INC
203 N LASALLE STE M5
CHICAGO IL 60601

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:   L52851

Change Effective Date:   08-13-07

**PREMIUM SUMMARY**

No Additional or Return Premium
Direct Billed

**CHANGES:**

CHANGED MAILING ADDRESS TO 203 N LASALLE STE M5 CHICAGO IL 60601

IL-7007 (6-01)                          Policyholder - Original                          SO 01 08/22/07



**COMMERCIAL UMBRELLA
COVERAGE PART**

### Amended Declarations

First Named Insured and Address:

ZEAG USA INC
203 N LASALLE STE M5
CHICAGO IL 60601

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

Agency Name and Number:

NORTHERN CAPITAL INSURANCE GROUP
6451-DS

Policy Number:  L52851

Policy Period:    Effective Date:    08-13-07

Expiration Date:    01-03-08

12:01 A.M. standard time at your mailing address shown in the declarations

### COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART

| Form Number | Form Title | Premium |
|---|---|---|
| CU-7072 (01-07) | Conditional Exclusion of Terrorism (Relating to Disposition of Fed. Act) . .$ | |
| CU-7008 (11-05) | Asbestos Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7010 (03-03) | Nuclear Energy Liability Exclusion Endorsement . . . . . . . . . . . . . . . . . . . | |
| CU-7031 (03-03) | Minnesota Amendatory Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| IL-0985R (01-06) | Disclosure Pursuant to Terrorism Risk Insurance Act of 2002 . . . . . . . . . . | |
| CU-7054 (03-03) | Fungi or Bacteria Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7037 (05-05) | Commercial Excess Liability Coverage Form . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7067 (03-03) | War Liability Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7062 (03-03) | Limited Terrorism Exclusion (Other than Cert Acts); Cap on Losses . . . . . | 56.00 |
| CU-7038 (06-06) | Illinois Amendatory Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CU-7066 (03-03) | Exclusion of Punitive Damages Related to a Certified Act of Terrorism . . . | |

**Advance Endorsement Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    **56.00**

### PREMIUM SUMMARY

Advance Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    5,624.00

Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56.00

**Total Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    **5,680.00**

### ADDITIONAL NAMED INSUREDS

WHO IS AN INSURED includes the following Additional Named Insureds:

NONE

Policy Number:      L52851
Effective Date:      08-13-07

## LIMITS OF INSURANCE

General Aggregate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    1,000,000

Products-Completed Operations Aggregate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

Each Occurrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1,000,000

## PREMIUM COMPUTATION

Not Subject to Audit

Estimated Advance Premium  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$   . 5,624.00

## SCHEDULE OF UNDERLYING INSURANCE - GENERAL LIABILITY

Policy Number:    CG-L52851
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:     03-02-07 To 01-03-08

Occurrence Coverage

**Limits or Amounts of Insurance**

General Aggregate Limit (Other Than Products-Completed Operations) . . . . . . . . . . . . .$   2,000,000

Products-Completed Operations Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1,000,000

Personal and Advertising Injury Limit (Any One Person or Organization) . . . . . . . . . . . . .   1,000,000

Each Occurrence Limit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1,000,000

## SCHEDULE OF UNDERLYING INSURANCE - AUTOMOBILE LIABILITY

Policy Number:    CA-L52851
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:     03-02-07 To 01-03-08

**Limits or Amounts of Insurance**

Bodily Injury and Property Damage Combined Single Limit (Each Accident) . . . . . . . . . .$   1,000,000